UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RICHARD T. AICHER, JR.,                    :

            Plaintiff,              :

                         :    Civil Action No. 3:12-cv-
                                                01781-FLW-TJB
            vs.                     :

IBEW LOCAL UNION NO. 269 JOINT:             **Return Date: Jan. 6, 2014**
FUNDS OFFICE et als.,                       **Oral Argument Requested**
                                           :
            Defendants.

                                           :


**PLAINTIFF RICHARD T. AICHER, JR.'S BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**


McMORAN O'CONNOR & BRAMLEY, PC
Ramshorn Executive Centre
2399 Highway 34 Suite D-1
Manasquan, New Jersey 08736
(732) 223-7711
(732) 223-7750
moconnor@mcmoranlaw.com

Attorneys for Plaintiff,
Richard T. Aicher, Jr.

On the brief:

     Michael F. O'Connor

## TABLE OF CONTENTS

Page No.

TABLE OF CONTENTS........................................i

TABLE OF AUTHORITIES....................................iii

PRELIMINARY STATEMENT....................................1

STATEMENT OF FACTS .....................................3

LEGAL ARGUMENT.........................................19

    SUMMARY JUDGMENT ON COUNT FOUR OF THE
    COMPLAINT SHOULD BE DENIED BECAUSE PLAINTIFF
    WAS ENTITLED TO PENSION BENEFITS FROM
    SEPTEMBER 1, 2010 ONWARD ...........................19

    A.   SUMMARY JUDGMENT STANDARD .....................19

    B.   STANDARD OF REVIEW ...........................19

    C.   DEFENDANTS MAY NOT RELY ON THE
       "ELECTRICAL CONSTRUCTION INDUSTRY"
       DISQUALIFICATION IN THE PLAN ...................20

      1.  Defendants may not rely on a *post hoc*
         reason for denying benefits.................20

      2.  Article VI(6)(a) of the Plan
         violates ERISA's anti-forfeiture
         provision ..................................24

    D.   PLAINTIFF'S EMPLOYMENT AS ADMINISTRATIVE
       MANAGER OF THE JOINT FUNDS OFFICE WAS
       NOT EMPLOYMENT IN THE "ELECTRICAL
       CONSTRUCTION INDUSTRY .........................26

      1.  Defendants admit that plaintiff's
         employment as Administrative Manager
         of the Joint Funds Office was not
         employment in the "electrical construction
         industry"...................................26

2.  Plaintiff did not work in the "electrical construction industry"..............27

E.  PLAINTIFF'S EMPLOYMENT AS ADMINISTRATIVE MANAGER OF THE JOINT FUNDS OFFICE WAS NOT EMPLOYMENT IN THE SAME TRADE OR CRAFT AS HIS PRIOR EMPLOYMENT ....................28

CONCLUSION...........................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Anderson v. Bakery and Confectionery Union and Industry
   International Pension Fund,
    728F.Supp.2d 644 (E.D.Pa. 2010) ............................ 23

Anderson v. Liberty Lobby,
    477 U.S. 242 (1986) ........................................ 19

Bruch v. Firestone Tire & Rubber Company,
    828 F.2d 134 (3d Cir. 1987), *affirmed in part, reversed*
    *in part on other grounds*, 489 U.S. 101 (1989) .............. 20

Metropolitan Life Ins. Co. v. Glenn,
    554 U.S. 105 (2008) ........................................ 20

Doyle v. Nationwide Ins. Companies & Affiliates Employee
   Health Care Plan,
    240 F.Supp.2d 328 (E.D. Pa. 2003) ......................... 23

Eisenrich v. Minneapolis Retail Meat Cutters and Food
   Handlers Pension Plan,
    574 F.3d 644 (8th Cir. 2009) .......................... 28, 29

Firestone Tire and Rubber Co. v. Bruch,
    489 U.S. 101 (1989) .................................. 19, 20

Fleisher v. Standard Ins. Co.,
    679 F.3d 116 (3d Cir. 2012) ............................... 20

Flinders v. Workforce Stabilization Plan of Phillips
   Petroleum,
    491 F.3d 1180 (10th Cir. 2007) ............................ 22

Gritzer v. CBS, Inc.,
    275 F.3d 291 (3d Cir. 2002) ............................... 28

Hannington v. Sun Life & Health Ins. Co.,
    711 F3d. 226 (1st Cir. 2013) .............................. 20

Johanssen v. Distr. No. 1 – Pac. Const. Dist. MEBA Pension
   Plan,
    292 F.3d 159 (4th Cir. 2002) .............................. 20

Jones v. Western Conference of Teamsters Pension Plan,
    2008 WL 3892055 (E.D.Cal August 21, 2008) ...................29

Levinson v. Weintraub,
    215 N.J. Super. 273 (App. Div. 1987) ........................26

Miller v. American Airlines, Inc.,
    632 F.3d 837 (3d Cir. 2011) .................................20

Nair v. Pfizer, Inc.,
    2009 WL 1635380 (D.N.J. June 10, 2009) ......................22

Riley v. Sun Life & Health Ins. Co.,
    657 F.3d 739 (8th Cir. 2011) ................................20

Schreibeis v. Retirement Plan for Employees of Duquesne
    Light Company,
    2005 WL 3447919 (W.D. Pa) ...................................22

Skretvedt v. E.I. DuPont de Nemours & Co.,
    268 F.3d 167 (3d Cir. 2001) .............................21, 22

Smith v. CMTA-IAM Pension Trust,
    654 F.2d 650 (9th Cir. 1981) ............................25, 29

Thomson v. I.A.M. National Pension Fund,
    616 F.2d 343 (7th Cir. 1980) ................................25

U.S. v. Lafferty,
    503 F.3d 293 (3d Cir. 2007) .................................27

University Hospitals of Cleveland v. Emerson Electric Co.,
    202 F.3d 839 (6th Cir. 2000) ................................21

Weil v. Ret. Plan Admin. Comm. of Terson Co.,
    933 F2d. 1045 (2d Cir. 1990) ................................20

## STATUTES

29 U.S.C. § 1053(a)(3)(B)(ii ...................................25

29 U.S.C. § 1053(a)(3)(B)(ii) ..................................25

29 U.S.C. § 1131(1) ............................................21

## OTHER AUTHORITIES

29 C.F.R. § 2530.203-3(c) ......................................25

29 C.F.R. § 2530.203-3(c)(2)(ii) .............................. 29

29 C.F.R. § 2560.503-1(g)(2001) .............................. 21

Fed. R. Civ. P. 56(c) ....................................... 19

## PRELIMINARY STATEMENT

Plaintiff Richard T. Aicher, Jr. respectfully submits this brief in opposition to defendants' motion for partial summary judgment on count four of the complaint.

Defendants have abandoned the reason for denying plaintiff's claim for retroactive pension benefits that they articulated during the administrative process. That reason fails as a matter of law for the reasons set forth in plaintiff's cross-motion for summary judgment.

Rather, defendants move for summary judgment based on a *post hoc* justification for denying plaintiff's claim for pension benefits, which appears for the first time in defendants' moving brief. Defendants invented this *post hoc* justification for denying benefits for this motion after realizing that their articulated reason for denying plaintiff's claim for benefits fails as a matter of law. However, under ERISA, a plan administrator may not shore up an administrative decision to deny benefits with a *post hoc* justification for its decision. Defendants' motion for summary judgment should be denied for this reason alone.

Should the Court consider defendants' *post hoc* justification, which it should not, summary judgment should still be denied because defendants' newly invented justification for denying benefits suffers from three fatal flaws.

First, the overly broad language of the Plan provision on which defendants now seek to rely violates ERISA's non-forfeiture rule because it authorizes the Plan to suspend benefits to a pensioner who accepts employment in the "electrical construction industry" regardless of his trade or craft or geographical area.

Second, even if the Plan complied with ERISA, which it does not, defendants have admitted that plaintiff's position as Administrative Manager of the Joint Funds Office was not in the "electrical construction industry."

Third, even if plaintiff's employment as Administrative Manager of the Joint Funds Office could be considered within the electrical construction industry, the motion would still fail because plaintiff's employment as Administrative Manager of the Joint Funds Office was not in the "same trade or craft" as his prior employment as an electrician and Assistant Business Manager of the Union.

Summary judgment should be denied for these reasons.

2

## STATEMENT OF FACTS

### A. PLAINTIFF'S PRE-2010 EMPLOYMENT

From 1971 to 1992, plaintiff worked as an electrician for employers who were party to the collective bargaining agreement ("CBA") between IBEW Local Union No. 269 (the "Union") and the Mercer County Division of the Southern New Jersey Chapter of the National Electrical Contractors Association (NECA). Plaintiff's Answer to Interrogatory No. 4 (Certification of Michael F. O'Connor at Exhibit 3).

From 1992 to 2010, plaintiff was employed by the Union as Assistant Business Manager and reported to the Business Manager. Transcript of Deposition of Richard T. Aicher (O'Connor Cert., Ex. 4) at 15:8-16:8. His job duties included organizing, representing the Union in grievances, and representing the Union in contract negotiations with NECA. Id. at 16:9-18:1.

### B. THE JOINT BOARD HIRES PLAINTIFF AS ADMINISTRATIVE MANAGER OF THE JOINT FUNDS OFFICE

The Joint Board of the Trustees of the Union's benefit plans established the Joint Funds Office to administer employee contributions to the Union's benefit plans. [1] Complaint (O'Connor Cert., Ex. 1) and Answer (O'Connor Cert., Ex. 2) at ¶¶5-6. The

---

[1] The Joint Funds Office did not act as the administrator of the Pension Plan. A third-party administrator, I.E. Shaffer, performed that function.

3

Director of the Joint Funds Office was responsible for the day-to-day operations of the office. Aicher Tr. at 31.

In 2007, plaintiff began serving in an unpaid role as managing trustee of the Joint Funds Office.    The role occupied zero to two hours of his time per week. Aicher Tr. at 18:25-19:4. Plaintiff's role as managing trustee was not related to his employment as Assistant Business Manager.    Rather, plaintiff performed this function as a trustee of certain of the Union benefit plans. Aicher Tr. at 18:8-19:4, 19:10-23:5 and 29:19-30:12; Complaint at ¶11 (O'Connor Cert., Exhibit 1); Defendants' Answer at ¶11 (O'Connor Cert., Exhibit 2).    No pension contributions were made to the Plan on his behalf for the unpaid service he rendered as managing trustee of the Joint Funds Office.    Aicher Certification at ¶3.

In June 2010, Stephen Aldrich, the Union's newly elected Business Manager, informed plaintiff that he intended to eliminate plaintiff's position as Assistant Business Manager, terminate the Director of the Joint Funds Office, and appoint plaintiff the full-time Administrative Manager of the Joint Funds Office. Aicher Tr. 28:8-29:18. On June 28, 2010, at a meeting of the Joint Board of Trustees of the Union benefit plans, the Joint Board formally eliminated the position of Director of the Joint Funds Office.    After it eliminated the Director position, the Joint Board offered plaintiff a paid

4

full-time position as Administrative Manager of the Joint Funds Office at the same rate of pay as the former Director. Complaint at ¶¶5-6, 12-14; Defendants' Answer at ¶¶5-5, 13-14. Plaintiff, whose position as Assistant Business Manager was eliminated, accepted the job and started on July 12, 2010. Aicher Tr. at 32:8-11, 62:25-63:6; Plaintiff's Answer to Interrogatory Nos. 2-4, 6 (O'Connor Cert. Ex. 3).

C. **PLAINTIFF'S JOB AS ADMINISTRATIVE MANAGER WAS ENTIRELY DIFFERENT THAN HIS PRIOR JOBS AS AN ELECTRICIAN AND ASSISTANT BUSINESS MANAGER OF THE UNION**

As the full-time, paid Administrative Manager of the Joint Funds Office, plaintiff assumed the day to day responsibilities of running the office, which had been the job of the Office's Director. Aicher Tr. at 31:16-23.  His job duties were purely administrative. They included supplying information requested by the accounting and financial professionals who handled the funds' accounting, audits and investments, collecting delinquent contributions from participating employers and responding to questions from plan participants.  Id. at 51:4-57:10; see also Plaintiff's Answer to Interrogatory No. 2 (O'Connor Cert., Ex. 3).

As Administrative Manager of the Joint Funds Office, plaintiff did not perform estimates, supervise electricians or perform electrical work.  Transcript of Deposition of Ronald Warr (O'Connor Cert., Ex. 9). He did not organize workers,

handle grievances or participate in contract negotiations. Plaintiff's Answer to Interrogatory No. 2.

The job plaintiff performed as Administrative Manager of the Joint Funds Office was entirely different than his prior jobs as an electrician and Assistant Business Manager of the Union. As Plan Trustee Ronald Warr admitted, his job was not part of the "electrical construction industry" as the IBEW Local Union No. 269 Pension Plan (the "Plan") defined that term. Warr Tr. at 28:12-15. Rather, plaintiff's job as Administrative Manager of the Joint Funds Office was no different than the job performed by I.E. Shaffer, the third party administrator of the pension plan. Transcript of Deposition of Wayne DeAngelo (O'Connor Cert., Ex. 11) at 33:3-8.

D. **PLAINTIFF WAS ELIGIBLE FOR A NORMAL RETIREMENT PENSION WHEN HE BEGAN HIS EMPLOYMENT AS ADMINISTRATIVE MANAGER OF THE JOINT FUNDS OFFICE**

Plaintiff was a participant in the IBEW Local Union No. 269 Pension Plan (the "Plan"), an ERISA governed pension plan, in both the electrician and Assistant Business Manager positions. Complaint at ¶¶7-8 (O'Connor Cert., Exhibit 1); Defendants' Answer at ¶¶7-8 (O'Connor Cert., Exhibit 2) (Doc. 16); IBEW Local Union No. 269 Pension Plan (O'Connor Cert., Exhibit 12); Plaintiff's Answer to Defendants First Set of Interrogatories. Aicher Tr. at 10:21-11:8, 12:12-21, 15:12-24.

Article IV(2) of the Plan states that a participant is eligible for a Normal Retirement Pension when the combination of his age and years of service exceed 85. As of January 1, 2004, based on his age of fifty-two and his thirty-three years of credited service under the Plan, plaintiff had a 100% vested, non-forfeitable right to his accrued pension benefit. Plaintiff's Answer to Defendants' Interrogatory No. 1; Plan at Article IV(2). He was therefore eligible for a Normal Retirement Pension at the time he became employed as Administrative Manager of the Joint Funds Office in July 2010. Plan at Article IV(2); Complaint at ¶16; Defendants' Answer at ¶16.

**E. <u>PLAINTIFF APPLIES FOR A PENSION</u>**

Plaintiff's compensation as Administrative Manager of the Joint Funds Office was approximately 30% less than his compensation had been when he was Assistant Business Manager. Complaint at ¶15; Defendants' Answer at ¶15. Accordingly, in June 2010, after Aldrich had informed him that he would replace the Director of the Joint Funds Office as the office's Administrative Manager, plaintiff began considering taking his pension to offset the reduction in his pay. Aicher Tr. at 61:11-62:8.

On June 15, 2010, plaintiff emailed the Plan's attorney, Michael T. Scaraggi, Esq., and informed Scaraggi that he intended to apply for his pension to make up the difference

7

between his compensation as Assistant Business Manager and Administrative Manager of the Joint Funds Office. O'Connor Cert., Ex. 15; Scaraggi Tr. at 41:6-23. In reference to Article VI(6)(b) of the Plan, which provided that pension payments shall stop if a pensioner accepts employment in the "electrical construction industry," plaintiff specifically stated that his employment as Administrative Manager was not work in the "electrical construction industry." Id. Scaraggi did not disagree. At the time, other Plan participants were receiving pension benefits while gainfully employed, including Ken Shea, the president of Carlin Electric, who was a Trustee of the Plan, and David Rowe, a former electrician who was performing estimates for Lessner Electric. Transcript of Deposition of Kenneth Shea (O'Connor Cert., Ex. 5) at 11:4-12:12, 16:25-18:1, 21:17-27:23; Transcript of Deposition of Michael T. Scaraggi, Esq. (O'Connor Cert., Ex. 6) at 17:17-24:22; April 2, 2010 Correspondence from Jed Marcus, Esq. to Michael Scaraggi, Esq. (O'Connor Cert., Ex. 13); May 14, 2010 Minutes of the Joint Board Meeting (O'Connor Cert., Ex. 14).

On June 28, 2010, after the Joint Board meeting at which plaintiff was named Administrative Manager of the Joint Funds Office, plaintiff discussed his intention to retire and begin receiving his pension benefit with Scaraggi. Aicher Tr. at 66:4-10, 78:9-80:15; Scaraggi Tr. at 10-12. When they discussed

8

Article VI(6)(a) of the Plan, which stated that pension payments would cease if a pensioner accepted employment in a position in which pension credits were earned, Scaraggi told plaintiff he had an absolute right to opt out of the Plan and begin receiving his pension. Aicher Tr. at 78:5-80:15.

Following their conversation, Scaraggi, in his capacity as the Plan's attorney, prepared a form through which plaintiff could waive his right to accrue pension credits under the Plan. Complaint at ¶20; Defendants' Answer at ¶20; Aicher Tr. at 81:12-15. On August 24, 2010, plaintiff executed the "Waiver of Participation in the IBEW Local Union No. 269 Pension Plan" and waived his right to accrue future benefits in exchange for the right to begin receiving his retirement pension. Complaint at ¶19; Defendants' Answer at ¶19; Waiver of Participation (O'Connor Cert., Ex. 16).

On August 27, 2010, plaintiff submitted an application for an early retirement pension from the Plan to I.E. Schaffer & Co., the administrator of the Plan, on the required form.[2] Complaint at ¶23; Defendants' Answer at ¶23; Pension Application (O'Connor Cert., Ex. 17); Aicher Tr. at 94:16-95:11. The application included the signed waiver. O'Connor Cert., Ex. 17.

---

[2]Although plaintiff's application used the terminology "early retirement," as of August 27, 2010, plaintiff qualified for a Normal Retirement Pension because the sum of his age and years of covered service exceeded 85. Plan at Article IV(2).

9

F. **PLAINTIFF INFORMS THE JOINT BOARD OF HIS INTENTION TO BEGIN TAKING HIS PENSION**

On August 27, 2010, plaintiff met with the Trustees of the Plan and informed the Trustees of his intention to waive his right to accrue pension benefits, exercise his right to receive a retirement pension from the Plan, and continue his employment as Administrative Manager of the Joint Funds Office. Complaint at ¶22; Defendants' Answer at ¶22. He specifically informed the Trustees that he would opt out of continued participation in the Plan but continue to work as Administrative Manager of the Joint Funds Office, and the arrangement would not violate the return to work rules of the Plan.  August 27, 2010 Minutes of the Joint Board Meeting at item 25. (O'Connor Cert., Ex. 18).  No one disagreed.  Scaraggi Tr. at 70:13-71:4.

As plaintiff left the meeting after his announcement, he overheard Aldrich exclaim, "If you think I'm standing up in front of the membership and telling them he is working in the funds office and getting a pension you're nuts." Aicher Tr. at 91:1-17.  At the executive session held after plaintiff's announcement, the Trustees expressed concern that plaintiff's plan to retire would upset the rank and file members of the Union.  Transcript of Deposition of Jonathan Levine (O'Connor Cert., Ex. 7) at 61:8-18.  The remarks echoed remarks made in July 2010 after plaintiff informed Stephen Aldrich, the Business

Manager, and Wayne DeAngelo, the Assistant Business Manager, that he intended to begin receiving a retirement pension from the Plan to offset the reduction in his pay. At that time, DeAngelo told Aldrich that if plaintiff began receiving his pension while continuing his employment as Administrative Manager for the Joint Funds Office, it would upset the "rank and file" and undermine Aldrich's opportunity to be re-elected as Business Manager. Complaint at ¶¶17-18; Defendants' Answer at ¶¶17-18.

**G. THE JOINT BOARD INTERFERES WITH PLAINTIFF'S RIGHT TO RECEIVE RETIREMENT PENSION BENEFITS**

On September 3, 2010, the Joint Board held a Special Meeting to discuss plaintiff's plan to retire for pension purposes and continue working as Administrative Manager. Complaint at ¶24; Defendants' Answer at ¶24. During its deliberations, the Joint Board again expressed concern over the impact plaintiff's plan to collect his pension and continue to work as Administrative Manager would have on the rank and file union members. Id.

Ultimately, the "Trustees acknowledged the qualifications of Aicher as an Administrative Manager and based upon 'current circumstances' determined that Aicher either had to be a participant of all Benefit Funds including the Local 269. Pension Plan or retire." Complaint at ¶27; Defendants' Answer at

11

¶27. In other words, the Trustees rejected plaintiff's waiver of his right to earn pension credits. However, nothing in the Pension Plan or any other welfare benefit plan required an employee to participate in all plans or none. Scaraggi Tr. at 87:12-18.

On September 3, 2010, after the Special Meeting, Scaraggi informed plaintiff that the Joint Board was giving him an ultimatum: he could either take his pension and forfeit his job or keep his job and forego his retirement pension. Complaint at ¶29; Defendants' Answer at ¶29; Aicher Tr. at 101:14-102:12. Following the September 3, 2010 Special Meeting, I.E. Schaffer, the third-party administrator of the Pension Plan, was instructed that it should not process plaintiff's application for pension benefits. Levine Tr. at T8:24-9:5, 13:22-25, 65:11-66:7.

Later on September 3, 2010, plaintiff sent Scaraggi an email, which memorialized their conversation. September 3, 2010 email from Richard T. Aicher, Jr. to Michael T. Scaraggi, Esq. (O'Connor Cert., Ex. 19); Aicher Tr. at 103:12-104:2; Scaraggi Tr. at 90:20-25.

Among other things, the email stated:

> [T]he Union Trustees especially, are concerned about the perception of the membership of Local 269, if I continue as the Administrative Manager while receiving my pension benefit. They feel it would be viewed as some form of improper conduct.

However, you have indicated to both the Trustees and me, that such a circumstance is not improper nor would it, in your opinion, violate the Pension Plan's return to work provisions; hence, there is no legal reason that I cannot receive the Pension Benefit while employed as the Administrative Manager.

Nonetheless, the Trustees have given me a choice: I can collect my pension benefits and forfeit my position as Administrative Manager; or withdraw my pension application and keep my job.

Unless I hear from you in the next few days otherwise, I will consider this summary of this morning's discussion to be accurate…

O'Connor Cert., Ex. 18.

Scaraggi never told plaintiff the email was inaccurate. Scaraggi Tr. at 90:25-91:3, 92:8-10. To the contrary, he told plaintiff he was "ok" with the email and it was "accurate." Aicher Tr. at 107:20-108:3.

## H. THE TRUSTEES FAIL TO RESPOND TO PLAINTIFF'S CLAIM FOR BENEFITS

The Trustees of the Pension Plan are the named fiduciary responsible for the administration and operation of the Plan. Plan at Article IX(1). Among other things, the Plan requires the Trustees to notify any participant whose claim for benefits is denied of the denial and the specific reasons therefore in writing. Plan at Article IX(3).

As of September 27, 2010, the Trustees had neither approved plaintiff's August 27, 2010 claim for benefits nor provided plaintiff with a written denial of his pension claim. Aicher

Tr. at 138:6-139:7.   On September 27, 2010, plaintiff wrote to Scaraggi and objected to the ultimatum the Joint Board had given him on September 3, 2013.  Complaint at ¶¶30-31; Defendants' Answer at ¶¶30-31; September 27, 2013 Correspondence from Richard T. Aicher, Jr. to Michael T. Scaraggi, Esq. (O'Connor Cert., Ex. 20); Scaraggi Tr. at 92:17-93:2.

In pertinent part, the letter stated:

> You advised me that I was entitled to my pension benefit while remaining employed as Administrative Manager; provided, I agreed to "opt-out" of future participation in the Pension Plan.  We agreed that it was clear my employment as the Administrative Manager would not violate the return-to-work provisions of the Plan.
>
> *      *      *
>
> Clearly, as the Administrative Manager of the Local 269 Funds Office (a salaried office position), I am not working in the same industry (electrical construction) or in the same trade or craft (electrician), so as to be a threat to undercut the wages and working conditions of employees covered by the Plan.

O'Connor Cert., Ex. 20.

Invoking the claim procedure set forth in the Plan, plaintiff requested that the Trustees issue a written determination of his claim for benefits.  Id.

Plaintiff subsequently called Scaraggi and asked him if he had received the letter.  Scaraggi told him he had received the letter and distributed it to the Trustees.  Aicher Tr. at 110:10-111:12.  Scaraggi further stated that he would put the

14

issue on the Joint Board's agenda and would respond to the letter. Aicher Tr. at 111:13-15; Scaraggi Tr. at 94:3-25. However, Scaraggi never put the matter on the agenda or responded to the September 27, 2010 letter. Aicher Tr. at 111:16-18.

Plaintiff followed up with Scaraggi a second time and asked him if he was going to respond to the letter and Scaraggi admitted he owed plaintiff a response. Aicher Tr. at 120:4-121:1. However, neither the Trustees of the Pension Plan nor Scaraggi provided a written response to plaintiff's claim for benefits at any time prior to plaintiff's December 15, 2011 termination.

I. **DEFENDANTS RETALIATE AGAINST PLAINTIFF FOR PURSUING HIS CLAIM FOR RETIREMENT PENSION BENEFITS**

On November 23, 2011, plaintiff's counsel wrote to the Trustees of the Plan and requested a written determination of his August 27, 2010 claim for a retirement pension. Complaint at ¶37; Defendants' Answer at ¶37; November 23, 2011 Correspondence from Michael F. O'Connor, Esq. to Trustees attached to the O'Connor Cert. as Exhibit 21. The letter specifically denied that plaintiff's employment as Administrative Manager of the Joint Funds Office was in an "electrical trade or craft." The letter further indicated that if plaintiff did not receive a written determination within ten (10) days, he would construe

15

the silence as a denial and file an appeal; and, if the appeal were ignored, he would file suit. Complaint at ¶38; Defendants' Answer at ¶38; O'Connor Cert., Ex. 21.

On November 28, 2011, Scaraggi responded on behalf of the Plan and indicated that "while I may not be able to provide to you a written position within ten days of November 23, 2011, a detailed position will be provided." Complaint at ¶39; Defendants' Answer at ¶39; November 28, 2011 Correspondence from Michael T. Scaraggi, Esq. to Michael F. O'Connor, Esq. (O'Connor Cert., Ex. 22). He offered no substantive response.

On November 28, 2011, through his counsel, plaintiff reiterated that if he did not receive a timely determination of his claim, he would file an appeal. Complaint at ¶40; Defendants' Answer at ¶40; November 28, 2011 Correspondence from Michael F. O'Connor, Esq. to Michael T. Scaraggi, Esq. attached to the O'Connor Cert. as Exhibit 23.

On December 15, 2011, three weeks after his attorney had insisted that the Trustees of the Pension Plan address his claim, the Joint Board terminated plaintiff's employment. Complaint at ¶42; Defendants' Answer at ¶42. Prior to the termination, neither Scaraggi nor anyone else acting on the Plan's behalf had responded in writing to his claim for pension benefits. In particular, no one had informed plaintiff that he

16

was not entitled to his pension because he was working in the "electrical construction industry."

## J. DEFENDANTS FAIL TO PAY PLAINTIFF THE RETIREMENT BENEFITS TO WHICH HE IS ENTITLED

On January 3, 2012, I.E. Shaffer, the third party administrator for the Plan, informed plaintiff that his August 27, 2010 application for pension benefits had been approved effective January 1, 2012. Complaint at ¶49; Defendants' Answer at ¶49; January 3, 2012 Correspondence from Glenn D. Shaffer to Richard Aicher (O'Connor Cert., Ex. 24). I.E. Shaffer did not set forth a reason for denying the claim for benefits retroactive to September 1, 2010, the first month following plaintiff's August 27, 2010 claim for pension benefits. Complaint at ¶50; Defendants' Answer at ¶50.

On January 25, 2012, plaintiff appealed the denial of his claim for pension benefits between September 1, 2010 and December 31, 2011 to the Trustees of the Plan. Complaint at ¶51; Defendants' Answer at ¶51; January 25, 2012 Correspondence from Michael F. O'Connor, Esq. to Trustees of IBEW Local No. 269 Pension Plan (O'Connor Cert., Ex. 25); Scaraggi Tr. at 148:21-149:8. At the time, the Plan Trustees included three Union trustees, one of whom was Aldrich, and three employer trustees, who owned businesses which funded the Plan. February 24, 2012 Minutes of the Joint Board (O'Connor Cert., Ex. 26); Deposition

17

Tr. of Michael Nielsen (O'Connor Cert., Ex. 8) at 6:4-8, 10:19-23; Deposition Transcript of Ronald Warr (O'Connor Cert., Ex. 9) at 8:8-15, 14:9-25; Collective Bargaining Agreement (O'Connor Cert., Ex. 27) at 33.

Plaintiff's appeal claimed that as of September 1, 2010, he qualified for a retirement pension based on his age and years of service. Complaint at ¶52; Defendants' Answer at ¶52; O'Connor Cert., Ex. 25. Plaintiff's appeal specifically stated that Article VI(6)(b)of the Plan did not apply because plaintiff did not work in an electrical trade or craft. O'Connor Cert. Ex. 25.

On February 29, 2012, the Trustees denied plaintiff's claim for retroactive pension benefits based solely on their determination that he was estopped from claiming retroactive pension benefits because he had (a) failed to raise the Trustees' failure to decide his claim for benefits at any time between August 27, 2010, when he submitted his pension claim, and his counsel's November 23, 2011 correspondence and (b) received pension credits during his employment as Administrative Manager. Complaint at ¶¶54, 57; Defendants' Answer at ¶¶54, 57; February 29, 2012 Correspondence from Michael T. Scaraggi, Esq. to Michael F. O'Connor, Esq. (O'Connor Cert., Ex. 27); Scaraggi Tr. at 156:2-5. The Trustees did not dispute plaintiff's contention that Section VI(6)(b) of the Plan did not apply

18

because his job as Administrative Manager of the Joint Funds Office was not in an "electrical trade or craft."

**LEGAL ARGUMENT**

**SUMMARY JUDGMENT ON COUNT FOUR OF THE COMPLAINT SHOULD BE DENIED BECAUSE PLAINTIFF WAS ENTITLED TO PENSION BENEFITS FROM SEPTEMBER 1, 2010 ONWARD**

**A. SUMMARY JUDGMENT STANDARD**

Summary judgment is only appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material facts exists where the facts, viewed in the light most favorable to the non-movant, could support a verdict in the non-movant's favor. Unless the facts are so "one-sided" that judgment is appropriate as a matter of law, then summary judgment should be denied. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 252 (1986).

**B. STANDARD OF REVIEW**

Under ERISA, benefit denials must be reviewed de novo unless the plan gives the administrator the authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). In that case, administrative decisions are reviewed

under the "arbitrary and capricious" or "abuse of discretion" standard. Id.; Fleisher v. Standard Ins. Co., 679 F.3d 116, 120-121 (3d Cir. 2012).

"An arbitrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. American Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (citation omitted). A court determines whether an arbitrator's decision was erroneous as a matter of law de novo. Federal courts, which are experts on federal law, owe no deference to the legal determinations of plan administrators, who are not. Bruch v. Firestone Tire & Rubber Company, 828 F.2d 134, 148-49 (3d Cir. 1987), *affirmed in part, reversed in part on other grounds*, 489 U.S. 101 (1989); see also Hannington v. Sun Life & Health Ins. Co., 711 F3d. 226, 230-31 (1st Cir. 2013); Riley v. Sun Life & Health Ins. Co., 657 F.3d 739, 741-42 (8th Cir. 2011); Johanssen v. Distr. No. 1 – Pac. Const. Dist. MEBA Pension Plan, 292 F.3d 159, 169 (4th Cir. 2002), *abrogated on other grounds by* Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008); Weil v. Ret. Plan Admin. Comm. of Terson Co., 933 F2d. 1045, 1049 (2d Cir. 1990).

C. **DEFENDANTS MAY NOT RELY ON THE "ELECTRICAL CONSTRUCTION INDUSTRY" DISQUALIFICATION IN THE PLAN**

   1. **Defendants may not rely on a *post hoc* reason for denying benefits**

An administrator may not rely on a *post hoc* reason for denying benefits raised for the first time in federal court. Section 503 of ERISA is explicit that an administrator must provide "specific reasons" for the denial of benefits in the denial letter.    29 U.S.C. § 1131(1); see also 29 C.F.R. § 2560.503-1(g)(2001).    "One of the main purposes for the requirement that the denial letter provide specific reasons is to provide claimants with enough information to prepare adequately for further administrative review <u>or an appeal to the federal courts</u>."   <u>Skretvedt v. E.I. DuPont de Nemours & Co.</u>, 268 F.3d 167, 178 n. 8 (3d Cir. 2001) (emphasis added) (quoting <u>DuMond v. Centex Corp.</u>, 172 F.3d 618, 622 (8th Cir. 1999).

In <u>Skretvedt</u>, the Third Circuit did not have to reach the issue of whether a pension board could rely on a *post hoc* reason for denying benefits in litigation because even the *post hoc* reason given by the board was legally inadequate.  <u>Id.</u>  However, the Third Circuit noted its agreement with the Sixth Circuit's decision in <u>University Hospitals of Cleveland v. Emerson Electric Co.</u>, 202 F.3d 839 (6th Cir. 2000), where the court held that it would not defer to *post hoc* rationales for denying benefits developed for the purpose of litigation when those rationales did not appear in the denial letter sent to the claimant.  <u>Id.</u>  In pertinent part, the Sixth Circuit held:

> [I]t strikes us as problematic… to allow the administrator to "shore up" a decision after the fact by testifying to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review… To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them – or worse, federal judges – to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

Id. (quoting Emerson, 202 F.3d at 849 n. 7).

While the Third Circuit has not decided the issue of whether an administrator may rely on a *post hoc* rationale for denying benefits since Skretvedt, a number of federal courts of appeal besides the Sixth Circuit have held that *post hoc* rationales for denying claims for benefits devised after the fact for litigation will not be considered. See Flinders v. Workforce Stabilization Plan of Phillips Petroleum, 491 F.3d 1180, 1191 (10th Cir. 2007) (collecting cases from the 4th, 5th, 8th, 9th and 10th Circuits). Moreover, district courts within the Third Circuit have heeded Skretvedt and rejected attempts to "shore up" denials of benefits with *post hoc* rationales not raised during the administrative process. See Nair v. Pfizer, Inc., 2009 WL 1635380 (D.N.J. June 10, 2009) at *10[3]; Schreibeis v. Retirement Plan for Employees of Duquesne Light Company, 2005

---

[3] See Exhibit A.

WL 3447919 (W.D. Pa) at *7-9[4]; and, <u>Doyle v. Nationwide Ins.</u> <u>Companies & Affiliates Employee Health Care Plan</u>, 240 F.Supp.2d 328, 347 (E.D. Pa. 2003); but see <u>Anderson v. Bakery and</u> <u>Confectionery Union and Industry International Pension Fund</u>, 728 F.Supp.2d 644, 656 (E.D.Pa. 2010).

This Court should do the same and reject defendants' *post hoc* rationale for denying plaintiff's claim for benefits, which appears for the first time in defendants' brief and is not supported by any sworn testimony or statements from the Trustees. Indeed, there is nothing in the motion record that indicates that the Trustees, rather than their counsel, ever considered plaintiff's employment as Administrative Manager of the Joint Funds Office part of the "electrical construction industry."

Rather, the record shows that from the time plaintiff filed his claim on August 27, 2010 through the February 29, 2012 denial of plaintiff's appeal, the Trustees did not, at any time, inform plaintiff that he was disqualified from receiving pension benefits because his employment as Administrative Manager of the Joint Funds Office was in the "electrical construction industry." In particular, the Trustees failed to dispute plaintiff's contention that his employment as Administrative Manager of the Joint Funds Office was not in the "electrical

---

[4] See Exhibit B.

23

construction industry" on four occasions: (1) on August 27, 2010, when plaintiff informed the Joint Board that he could claim his pension and continue to work as Administrative Manager of the Joint Funds Office without violating the Plan's return to work rules; (2) on September 27, 2010, when plaintiff informed the Plan's attorney in writing that his employment as Administrative Manager of the Joint Funds Office was not in the electrical construction industry; (3) on November 23, 2011, when plaintiff's attorney informed the Trustees in writing that plaintiff's employment as Administrative Manager was not in an electrical trade or craft; and, (4) on January 25, 2012, when plaintiff again stated that his employment as Administrative Manager was not in an electrical trade or craft in his appeal.

Defendants have abandoned their administrative reason for denying retroactive pension benefits because the fails as a matter of law for all of the reasons asserted in plaintiff's cross-motion for summary judgment. Defendants should not be permitted to change course now because the reason on which they relied during the seventeen months plaintiff's claim was pending was incorrect as a matter of law. Summary judgment should be denied.

## 2. Article VI(6)(a) of the Plan violates ERISA's anti-forfeiture provision

Even if the Court entertains defendants' *post hoc* justification for denying plaintiff's claim for benefits, summary judgment should be denied because Article VI(6)(a) of the Plan violates ERISA's anti-forfeiture provision, 29 U.S.C. § 1053(a)(3)(B)(ii). Under 29 U.S.C. § 1053(a)(3)(B)(ii,) a forfeiture provision in a multi-employer ERISA-governed benefit plan is valid only if it provides for the suspension of accrued benefits where the employee works "in the same industry, in the same trade or craft, and the same geographic area covered by the plan, as when such benefits commenced." See also 29 C.F.R. § 2530.203-3(c). Limitations that are not expressly permitted by § 1053 are unlawful. Thomson v. I.A.M. National Pension Fund, 616 F.2d 343, 346 (7th Cir. 1980).

The overly broad language of Article VI(6)(a) of the Plan violates ERISA's anti-forfeiture provision because it provides for the cessation of benefits to any pensioner who accepts employment in the "electrical construction industry" regardless of whether he is working in the same trade or craft or in the same geographic area as when he accrued his benefit. Since the Plan's forfeiture provision violates ERISA, the defendants may not rely on it to justify the denial of plaintiff's claim for retirement benefits. Smith v. CMTA-IAM Pension Trust, 654 F.2d 650, 659 (9th Cir. 1981); Thomson, supra, 616 F.2d at 346. Further, the Court may not rewrite the Plan to conform to

ERISA's requirements. <u>Levinson v. Weintraub</u>, 215 N.J. Super. 273, 276 (App. Div. 1987). Summary judgment should be denied.

### D. **PLAINTIFF'S EMPLOYMENT AS ADMINISTRATIVE MANAGER OF THE JOINT FUNDS OFFICE WAS NOT EMPLOYMENT IN THE "ELECTRICAL CONSTRUCTION INDUSTRY**

1. **Defendants admit that plaintiff's employment as Administrative Manager of the Joint Funds Office was not employment in the "electrical construction industry"**

Even if the Plan complied with ERISA, summary judgment would still be inappropriate because plaintiff's employment as Administrative Manager of the Joint Funds Office was not in the "electrical construction industry" as the Plan defines the term. Plan Trustee Ronald Warr expressly admitted this fact in his deposition:

Q.   His job was not part of the electrical construction industry, as the plan defines that term, correct?

A.   Correct.

Warr Tr. at 28:12-15 (O'Connor Cert., Ex. 9).

Moreover, during the administrative process, plaintiff asserted in the August 27, 2010 executive session of the Joint Board, his September 27, 2010 correspondence to the Plan's attorney, his attorney's November 23, 2011 letter to the Trustees and his attorney's January 25, 2012 appeal to the Trustees that his employment as Administrative Manager of the Joint Funds Office was not employment in the electrical construction industry, which triggered the cessation of benefits

26

under Article VI(6)(b) of the Plan.    On each occasion, the Trustees failed to reject plaintiff's assertion.    Given the Trustees' status as the named fiduciary, and their obligation under ERISA and Article IX of the Plan to provide plaintiff with the reasons for the denial of his claim in writing, their silence constitutes an adoptive admission of plaintiff's assertion that his employment as Administrative Manager of the Joint Funds Office was not employment in the "electrical construction industry." See U.S. v. Lafferty, 503 F.3d 293, 306 (3d Cir. 2007)(a statement is admissible as an adoptive admission "where the person would, under the circumstances, protest the statement made in his presence, if untrue").

The Plan also paid pension benefits to Ken Shea and David Rowe, pensioners who worked for electrical contractors in administrative positions.    The Plan would not have paid pension benefits to Mr. Shea and Mr. Rowe if they worked in the "electrical construction industry" as the Plan defined the term. Summary judgment should be denied.

## 2. Plaintiff did not work in the "electrical construction industry"

Viewed in the light most favorable to plaintiff, the evidence does not support defendants' contention that plaintiff's employment as Administrative Manager of the Joint Funds Office was in the electrical construction industry.

27

Rather, the evidence shows that plaintiff's employment as Administrative Manager of the Joint Funds Office was in the benefits industry. Wayne DeAngelo, the Assistant Business Manager of the Union, the President of the Union, and a current Trustee of the Pension Plan, admitted that as Administrative Manager of the Joint Funds Office, plaintiff performed the same function as I.E. Shaffer, the Plan's third party administrator. DeAngelo Tr. at 33:3-8 (O'Connor Cert., Ex. 11). Summary judgment should be denied.

E. **PLAINTIFF'S EMPLOYMENT AS ADMINISTRATIVE MANAGER OF THE JOINT FUNDS OFFICE WAS NOT EMPLOYMENT IN THE SAME TRADE OR CRAFT AS HIS PRIOR EMPLOYMENT**

Defendants' brief contains one conclusory statement, unsupported by any factual analysis or testimony from any Trustee, that plaintiff's employment as Administrative Manager of the Joint Funds Office was in the same "trade or craft" as his prior employment as an electrician and Assistant Business Manager of the Union. Def.Br. at 8. Defendants' conclusion, which should be reviewed *de novo*, was erroneous as a matter of law. See Eisenrich v. Minneapolis Retail Meat Cutters and Food Handlers Pension Plan, 574 F.3d 644, 648 (8th Cir. 2009)(plan's determination that plaintiff's job was in the same trade or craft is a legal determination reviewed *de novo*); see also Gritzer v. CBS, Inc., 275 F.3d 291, 296 (3d Cir. 2002) (*de novo*

standard applies where administrator did not provide any analysis to defer to).

The applicable regulation defines a "[t]rade or craft" as

(A) a skill or skills, learned during a significant period of training or practice, which is applicable in occupations in some industry, (B) a skill or skills relating to selling, retailing, managerial, clerical or professional occupations, or (C) supervisory activities relating to a skill or skills described in (A) of (B) of this paragraph (c)(2)(ii).

29 C.F.R. § 2530.203-3(c)(2)(ii).

Two jobs are considered in the same trade or craft if they utilize "significantly the same skills." Smith, supra, 654 F.2d at 659 n. 12 (9th Cir. 1981).

Plaintiff utilized different skills in the Administrative Manager position than he used in his prior two jobs. As Administrative Manager, plaintiff performed clerical duties, which were completely different in nature from the electrical work he performed as an electrician and the labor relations he performed as Assistant Business Manager. The Administrative Manager job was not in the same trade or craft as plaintiff's job as an electrician or his job as Assistant Business Manager of the Union. See e.g., Eisenrich, supra, 574 F.3d at 650 (delivering baked goods not the same trade or craft as meat cutting where different skills are used); and, Jones v. Western Conference of Teamsters Pension Plan, 2008 WL 3892055 (E.D.Cal August 21, 2008) at *4 (employment as a mail carrier was not in

29

the same industry and trade and craft as employment as a commercial truck driver).[5] Summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny defendants' motion for partial summary judgment on count four of the complaint.

Respectfully,

McMORAN O'CONNOR & BRAMLEY, PC
Counsel for plaintiff,
Richard T. Aicher, Jr.

By: _____
MICHAEL F. O'CONNOR

Dated: December 27, 2013

---

[5] See Exhibit C.

30

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

▷
NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Vasantha **NAIR**, Plaintiff,
v.
**PFIZER**, INC., et al., Defendants.

Civil Action No. 07–5203 (SRC).
June 10, 2009.

West KeySummary**Labor and Employment 231H**
🔑**576**

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(H) Coverage and Benefits of Particular Types of Plans
         231Hk576 k. Severance Plans. Most Cited Cases

Continued employment that employee was offered after employer was acquired by company was not comparable position to prior position, and thus employee was entitled to separation benefits under ERISA plan. The offered position constituted a demotion in that the employee no longer had employees reporting to her, was providing the services of a manager instead of a director, and had significantly different responsibilities. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Bruce P. McMoran, Michael Francis O'Connor, McMoran, O'Connor, & Bramley, PC, Manasquan, NJ, for Plaintiff.

John M. Nolan, Carla D. Macaluso, Jackson Lewis, Morristown, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

*1 This matter comes before the Court on the parties' cross-motions for summary judgment [docket entries 23 and 25] pursuant to Federal Rule of Civil Procedure 56. Additionally, Defendants Pfizer, Inc. ("Pfizer"), Pharmacia Separation Benefit Plan, and Pharmacia Separation Benefit Plan Administrative Committee ("Administrative Committee") (collectively, "Defendants") have filed a motion to strike the January 19, 2009 affidavit of Plaintiff Vasantha Nair ("Plaintiff" or "Nair") [docket entry 26]. Plaintiff has also filed a motion for leave to amend the Complaint pursuant to Federal Rule of Civil Procedure 15 [docket entry 30].

The motions have been fully briefed, and the Court has considered the parties' written submissions. It held oral argument on the summary judgment motions on May 4, 2009. For the reasons expressed in this Opinion, the Court will grant Plaintiff's motion for summary judgment as to her ERISA claim for benefits owed under her employee benefits plan (Count One of the Complaint) and deny the motion as to her claim for statutory penalties for failure to provide plan documents she requested (Count Two). Defendants' motion for summary judgment will be granted in part (as to Count Two) and denied in part (as to Count One). Defendants' motion to strike the January 19, 2009 Nair affidavit and Plaintiff's motion for leave to amend the Complaint will be both be dismissed as moot.

**I. BACKGROUND**

This action arises out of Pfizer's denial of Nair's separation benefits upon her termination of employment approximately six months after Pfizer acquired Pharmacia Corporation. Plaintiff sues for benefits she claims she is entitled to under the Pharmacia Separation Benefit Plan (the "Plan"), which by its terms

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
(Cite as: 2009 WL 1635380 (D.N.J.))

applies to all former Pharmacia employees for a period of two years following Pharmacia's acquisition by Pfizer. (Plan § 7.01) The Plan constitutes an employee welfare benefit plan under the Employee Retirement Income Security Act ("ERISA"), 15 U.S.C. § 1001, et seq., and thus this action is governed by ERISA.

### A. *Nair Becomes a Pfizer Employee*

Nair began her employment with Pharmacia in Sydney, Australia in 1997. In June 2002 she accepted a promotion to the position of Director, Global Management Development, which required her to relocate to New Jersey. In that position, Nair was responsible for designing and implementing organizational effectiveness and management development programs worldwide. As a Director, she supervised eight employees holding manager positions. Pharmacia classified positions into various bands, labeled A through E, for organizational and compensation purposes. Two Bands, D and E, were further tiered into four additional levels based on job scope, organizational impact, depth of knowledge/skills required, leadership provided and work complexity. According to this classification structure, which is set forth in Pharmacia's compensation guidelines, Nair's Director position placed her in job band D3, above tiers D1 and D2, which encompassed managers and senior managers, respectively. Nair's eight direct reports were classified as either D1 or D2. Nair's supervisor was classified as a Band E executive.

*2 On April 16, 2003, Pfizer completed its acquisition of Pharmacia, and Nair became an employee of Pfizer. Defendants admit that at some point after the acquisition, Nair's formal Pharmacia position of Director of Global Management was eliminated. It is undisputed, however, that throughout all times that she was employed by Pfizer, Nair retained the title of Director and received the same compensation she had as a Pharmacia D3 level employee. Defendants also point out that Plaintiff remained classified in job band D3, but they admit that Pfizer did not utilize Pfizer's banding structure and that the banding classifications

of all Pharmacia employees were locked in place at the time of the acquisition.

### B. *The Plan*

According to the Summary Plan Description, the Plan was amended in 2002, in anticipation of the acquisition by Pfizer, to make certain Pharmacia employees eligible for benefits upon the termination of their employment. The Plan states that it is intended to alleviate financial hardship that may be experienced by a Pharmacia employee upon a company-initiated termination. (Plan § 1 .02.) "In essence, benefits under the Plan are intended to be supplemental unemployment benefits." (*Id.*) In relevant part, the Plan provides that employees who are terminated due to a "Change in Control" [FN1] are entitled to receive separation benefits. (Plan § 3.01.) According to the Plan, a "Termination Due to Change in Control" is a "termination of an Employee's employment by the Company within two years following a Change in Control that is involuntary or that is a result of his or her rejection of an offer of continued employment with the Company or an affiliate if such employment is not a Comparable Position." (Plan, § 2.24.) In relevant part, the Plan defines the contours of eligibility for an employee experiencing a Termination Due to Change in Control as follows:

> FN1. The parties do not dispute that the Pfizer acquisition of Pharmacia constituted a "Change in Control" under the Plan.

[A] Terminated Employee shall not be eligible to be a Participant on account of a Termination Due to Workforce Restructuring, Termination Due to Change in Control or Termination for Non–Performance if the Terminated Employee's employment is terminated by the Company as a result of his or her rejection if such employment is a Comparable Position. However, such a Terminated Employee may be eligible for Benefits if he or she rejects an offer of continued employment with the company if such employment constitutes a

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

Demotion. To be eligible for Benefits in such a case the Participant must notify Human Resources that he or she is rejecting the offer of continued employment within two weeks of such offer of employment.
(Plan, § 3.01(d).)

Thus, the Plan provides that an employee may reject an offer of continued employment and still receive separation benefits, so long as the continued employment is not in a "Comparable Position" and so long as the rejection is made within two weeks of the offer. The Plan defines "Comparable Position" as "employment with the Company or a successor employer in which the individual's levels of responsibilities would not constitute a Demotion," provided that the employee does not have to relocate as set forth in the provision or materially increase business travel. (Plan, § 2.06) It further defines "Demotion" as "an offer of continued employment in a position that, as determined by the Company, constitutes (i) a demotion under Pharmacia's compensation guidelines or (ii) a position that is two or more levels lower on a Company-recognized career ladder, whether or not such employment is with the Company." (Plan, § 2.08.) Insofar as the provision applies to this case, it directs that to determine whether a job constitutes a "Demotion," one must refer to Pharmacia's compensation guidelines. (*Id.*)

**\*3** The Pharmacia compensation guidelines state that a "demotion occurs when an employee moves to a job with a lower band and/or tier than the current job." (Pharmacia U.S. Total Compensation Policies and Guidelines at 12). The guidelines set forth that a demotion is generally an involuntary move and, while a reduction in compensation is contemplated as a possibility, a demotion may occur without a change in compensation.

**C. *The HRSDI Position***
Shortly after the Change in Control, in or about May 2003, Nair met with James Topor, Pfizer's Di-

rector of Human Resources ("HR") Operations. Topor was managing the Human Resources Services Delivery Integration ("HRSDI") project, a project launched by Pfizer in 2003 to create an on-line portal through which Pfizer employees could access various HR information. In that meeting, Topor offered Nair a position as the team leader of the HRSDI project's User Experience sub-team. (This Opinion will hereinafter refer to this employment position as the "HRSDI job.") Other aspects of what Topor and Nair discussed in their meeting are disputed. According to Nair, she and Topor agreed that her work on the HRSDI project would be temporary, pending her placement at Pfizer in a position in organizational effectiveness, and would not jeopardize her right to separation benefits under the Plan. Nair also asserts that she and Topor agreed to meet again after she worked for three months on the HRSDI job to review whether she should continue in the job. Though Topor recalled having this meeting with Nair, he testified that he did not recall discussing the temporary nature of the assignment or its impact on her benefits.

In any event, in or about June 2003, Nair began to work on the HRSDI project. As leader of the User Experience sub-team, Nair's responsibilities consisted of tasks related to developing a user-friendly structure for the organization of content on the HR portal, including running focus groups, cataloging HR information and supervising team members. Nair described her job duties as User Experience sub-team leader as consisting of technical assignments on the computer rather than oversight over an area of work. She testified that such duties would have been performed by someone on the D1 level of Pharmacia's banding structure, in other words, by a manager. According to Nair, she performed the same project work as Diane Zanawicz, a Pfizer manager who led the Content & Services sub-team of the HRSDI project. Topor confirmed that while their jobs dealt with different substantive areas, Nair and Zanawicz had similar types of responsibilities as sub-team leaders. No employees reported to Nair in the HRSDI job, though some tasks

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

were delegated to consultants. Nair reported to Topor, a Director.

**D. *Nair Quits Pfizer and Seeks Separation Benefits***

In September 2003, after working on the HRSDI project for approximately three months, Nair had a conversation with Topor about getting her career back on track. She stated her desire to obtain a position in organizational effectiveness, and Topor suggested she meet with his supervisor Timothy Cowley, Vice President of HR Operations. Nair met with Cowley in October 2003. Cowley advised that there were no available positions in organizational effectiveness. Following Nair's conversations with Cowley about the lack of organizational effectiveness jobs at Pfizer, Nair quit Pfizer. On October 29, 2003, Nair informed Cowley that she did not wish to continue working on the HRSDI team and advised of her resignation of employment.

\*4 At some point in her October 2003 conversations with Cowley, Nair inquired about obtaining separation benefits. Cowley advised that she would not receive separation benefits. Nair asked for the basis for Pfizer's position that she was ineligible for benefits, but none was given. Immediately after terminating her employment with Pfizer, Nair took a job with Schering, a competing pharmaceutical company.

Nair continued to pursue her claim for separation benefits. In a December 3, 2003 e-mail to Cowley and Topor, Nair repeated her request for Pfizer's reason for deeming her ineligible. She did not receive a response, though Cowley denies receiving the e-mail. By letter of June 3, 2004, Nair again requested that Pfizer provide grounds for the denial of her claim. This letter was forwarded to the Administrative Committee, the body responsible for administration of benefits under the Plan. On June 23, 2004, in accordance with the Plan's process for contesting the administration of benefits, she filed a written claim with the Administrative Committee.

Barry Westgate, Pfizer's former Vice President of Global Compensation & Benefits and Chair of the Administrative Committee at all relevant times, led the review of Nair's claim. Westgate testified that on review of Nair's claim, the Administrative Committee "wanted to ensure that there was no demotion under the terms of the plan." (Westgate Dep. 28:17–19.) To do this, the Administrative Committee investigated what Nair's responsibilities in the HRSDI job were. Through questions posed to Cowley and to Michael Thomas, Vice President of Compensation at Pharmacia and then at Pfizer after the acquisition, it sought to determine the band and tier into which an employee with Nair's job responsibilities would be classified under the Pharmacia compensation structure. Westgate acknowledged at his deposition that if Nair's responsibilities in the HRSDI project job would have put her in a lower band and tier than her pre-acquisition position at Pharmacia, then Nair would have sustained a demotion. The testimony reads as follows:

> Q. Okay. When you talk about wanting to know the responsibilities of the job she was doing, you're referring to the job that she had at the time the claim was submitted?
>
> A. Yes.
>
> Q. The last job she had with Pfizer?
>
> A. Yes.
>
> Q. And you were trying—you were trying to determine what band a person with those responsibilities would have under the old Pharmacia band and tier structure, correct?
>
> A. That is correct.
>
> Q. If those job responsibilities would have put her in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
(Cite as: 2009 WL 1635380 (D.N.J.))

a band that was lower than the position that she held prior to the acquisition then that would constitute a demotion, correct?

A. Yes.

(Westgate Dep. at 31:20–32:11.) He also testified as to the Administrative Committee's focus on identifying the duties and responsibilities of the HRSDI job to determine whether it would be ranked in a lower job band than Nair's pre-acquisition position according to the Pharmacia band and tier structure:

*5 Q. Does this document refresh your recollection as to what Miss Nair's position was prior to the acquisition?

A. Yes.

Q. Is it your understanding the she was director of global management development?

A. If I take this a fact, yes.

Q. Did you ever learn anything in the course of your investigation that indicated that her position was not director of global management development?

A. In fact, we would not have been interested in that information.

Q. Why is that?

A. Because upon the change in control, everyone from Pharmacia had their band and tier locked in place, and so the only thing the committee would have looked at was whether the responsibilities that she claimed were a demotion were in fact—did not fit or did fit into the band and tier that were locked into place for her at the time of the change in control. So anything prior to the responsibilities that she was—under which she was submitting the claim

would not have had a bearing on our review.

(Id. at 37:16–38:16.)

The Administrative Committee denied Nair's claim for separation benefits. By letter of April 7, 2005, it informed Nair that her claim was denied for failure to "fulfill the applicable provisions of the Plan," following this explanation with a quote from section 2.06, which defines "Comparable Position." The letter did not explicitly state that the job offer Nair rejected was considered to be a "Comparable Position" nor was any further explanation given. Westgate testified that the Administrative Committee denied the claim because it concluded that Nair's HRSDI job did not constitute a "Demotion" under the Plan. He explained that this determination was based on the fact that Nair's compensation remained the same as it had been as a D3 level Pharmacia employee as did her job band and tier and title of Director. (He also pointed out that the HRSDI job did not require relocation, an aspect of the Comparable Position provision that is not at issue in this case). Westgate further stated that there was no additional reason why her claim was denied. Defendants have provided no evidence that, based on the responsibilities of the HRSDI job, the job would be ranked in the D3 band according to Pharmacia's compensation guidelines.

Nair appealed the claim pursuant to the Plan's procedures. By letter of July 28, 2005 Westgate informed Nair that the Named Appeals Fiduciary—at the time, Sylvia Montero—upheld the Administrative Committee's determination. No reasons were provided. When deposed, neither Wesgate nor Montero could recall the reason for denial of Nair's claim on appeal. The parties agree that Nair exhausted her administrative remedies prior to filing this litigation.

Nair initiated this lawsuit on October 30, 2007. The Complaint sets forth two causes of action. Count One pleads for benefits owed under the Plan, asserting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

a claim pursuant to <u>29 U.S.C. § 1132</u>(a) (1)(B). Count Two pleads for statutory penalties, pursuant to <u>29 U .S.C. § 1132</u>(c)(1), based on Defendants' alleged failure to produce Plan documents in a timely fashion as required by ERISA.

## II. DISCUSSION

### A. *Summary Judgment Standard*

\*6 The standard upon which a court must evaluate a summary judgment motion is well-established. <u>Federal Rule of Civil Procedure 56(c)</u> provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Fed.R.Civ.P. 56(c)</u>; *see also* <u>Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)</u>; <u>Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir.2000)</u>. In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See* <u>Boyle v. Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir.1998)</u>. The moving party bears the burden of establishing that no genuine issue of material fact remains. *See* <u>Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)</u>.

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)</u>; *see also* <u>Anderson, 477 U.S. at 247–48</u>. The Supreme Court has held that and <u>Rule 56(e)</u> "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depo-

sitions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." <u>Celotex, 477 U.S. at 324</u> (quoting <u>Fed.R.Civ.P. 56(e)</u>); <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992)</u>, cert. denied, <u>507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993)</u> ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but "must exceed the 'mere scintilla' threshold").

### B. *Plaintiff's Claim for Separation Benefits*

Plaintiff sues under ERISA for separation benefits according to the Plan. ERISA provides that a civil action may be brought by a plan participant or beneficiary to recover benefits due to her under the plan's terms. <u>29 U.S.C. § 1132</u>(a)(1)(B). Plaintiff's ERISA claim for benefits is an assertion of contractual rights, and accordingly breach of contract principles govern the instant dispute. <u>Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Foundation, 334 F.3d 365, 381 (3d Cir.2003)</u>; <u>Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 287 (3d Cir.1995)</u>. The Court must construe the Plan as a whole, and an unambiguous ERISA plan can be construed as a matter of law. <u>Kemmerer, 70 F.3d at 288–89</u>. Regarding the determination of whether a plan term is ambiguous, the Third Circuit has provided the following direction:

Whether terms in an ERISA Plan document are ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative interpretations. In determining whether a particular clause in a plan document is ambiguous, courts must first look to the plain language of the document. If the plain language of the document is clear, courts must not look to other evidence. But if the plain language leads to two reasonable interpretations, courts may look to extrinsic evidence to resolve any ambiguities in the plan document. However, it is inappropriate to consider such [extrinsic] evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

when no ambiguity exists.

*7 *Bill Gray Enters. v. Gourley,* 248 F.3d 206, 218 (3d Cir.2001) (internal citations and quotations omitted).

In this case, Plaintiff contends that Pfizer's denial of her benefits was incorrect because she suffered a "Termination Due to Change in Control," as defined by the Plan, which makes her eligible for separation benefits. Nair's claim under ERISA challenging the benefit denial requires that the Court review Defendants' benefits determination on a de novo standard, as the Plan expressly does not give the Administrative Committee discretionary authority to determine eligibility for benefits or construe the terms of the Plan after a Change in Control. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). (*See also* Plan, § 6.03.)

Defendants' argument in support of their benefits determination is two-fold. First, they maintain that Nair did not experience a Termination Due to Change in Control but rather resigned her employment voluntarily, because she was offered and rejected an offer of continued employment in a Comparable Position. Second, they argue that even if the Court finds that the job rejected by Nair was not a Comparable Position, or finds that a question of fact on this issue, Pfizer's denial of separation benefits must be upheld as justified under the Plan provision requiring that offers of continued employment must be rejected within two weeks for an employee to be eligible for benefits under the Plan. [FN2]

> FN2. Defendants would appear to give a third basis for their denial, namely, that Plaintiff voluntarily resigned her employment, making her ineligible for separation benefits under the Plan. This argument is really subsumed within their other arguments. The Plan defines "Voluntary Resignation" as a resignation that is a voluntary separation from employment initiated by the Employee *other than a Termination Due to Change in Control."* (Plan § 2.26) (emphasis added). The issue regarding when HRSDI job was rejected relates to eligibility for benefits based on a Termination Due to Change in Control. Because the Plan itself defines a Voluntary Resignation with reference to the term "Termination Due to Change in Control," Defendants' third ground boils down to the same issue.

*1. Comparable Position*

Both parties agree that as the Plan provision applies to this case, a Termination Due to Change in Control requires that Nair have rejected an offer of continued employment in a Comparable Position. Their dispute centers on whether the HRSDI job offered to Nair meets the Plan definition of Comparable Position. Plaintiff argues that the HRSDI job was not a Comparable Position because it involved responsibilities which would have been associated with a D1 manager position under the Pharmacia compensation guidelines, two tiers below the D3 Director position Nair held prior to the Change in Control. Defendants counter that the proper inquiry in determining whether HRSDI job was a Comparable Position must focus on whether it in fact constituted a Demotion, not on Plaintiff's subjective opinion that she suffered a Demotion. They argue that HRSDI job offered to Nair was not a Demotion because Nair retained her title of Director and received the same compensation she had before the Pfizer acquisition, facts that Nair concedes.

Interestingly, despite their divergent applications of the Plan to the facts, both parties take the position that the Plan's language regarding what constitutes a Comparable Position is clear and unambiguous. The Court agrees. The Court must look to the Plan's plain language to determine whether Nair is entitled to separation benefits. The critical provision of the Plan, quoted above in Section I of this Opinion, bears re-

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
(Cite as: 2009 WL 1635380 (D.N.J.))

peating. It states: " 'Comparable Position' means employment with the Company or a successor employer in which the individual's **levels of responsibilities** would not constitute a Demotion ..." (Plan § 2.06 (emphasis added).) In a separate provision, the Plan defines Demotion by reference to the Pharmacia compensation guidelines.

**\*8** The plain language of the Comparable Position definition requires consideration of how the responsibilities of the HRSDI job would rank the job on the Pharmacia banding system. Thus, Defendants place incorrect emphasis on the fact that the HRSDI job left Nair's with the same Director title and at the same compensation level she had as a D3 Pharmacia employee. If the levels of responsibilities in the HRSDI job indicate or are associated with a position that would trigger the Plan's definition of Demotion, then the employment is not in a Comparable Position and the employee's rejection of the job offer falls within the definition of Termination Due to Change in Control.

In that regard, Nair has pointed to ample evidence in the record that the levels of responsibilities in the HRSDI job render that job a Demotion. Nair testified that, based on her assignments, duties and responsibilities in the HRSDI project job, the position offered to her would be a manager position in job band D1 according to the Pharmacia compensation guidelines. She provided a comparison of the nature of the work in the HRSDI job to her role as Director of Global Management Development. She testified that no employees reported to her in the capacity she fulfilled in the HRSDI project, in contrast to her D3 Director position, where she had eight direct reports. Indeed, Nair reported *to* a director. Nair also stated under oath at her deposition that her duties and responsibilities as User Experience sub-team leader were most similar to those of Pfizer employee Zanawicz, another sub-team leader, who held a manager position.

Defendants on the other hand proffer no evidence

to contravert Nair's testimony regarding how the HRSDI job would map onto the Pharmacia band and tier system. Their witnesses admit their lack of information on this matter. Westgate testified that neither he nor the other Administrative Committee members reviewing Nair's claim had any knowledge of her HRSDI job duties. They have offered no witness who is able to determine what job band in the Pharmacia compensation guidelines would be applicable to Nair's HRSDI job. Defendants have not come forward with any evidence rebutting Nair's analysis that her responsibilities would have been assigned to a D1 manager in the Pharmacia banding system.

While Defendants argue that an employee, such as Nair, does not suffer a Demotion so long as her formal title and compensation remain the same,[FN3] this argument misses the mark on interpreting the critical definition of Comparable Position. Defendants' interpretation of the Plan effectively re-writes the "Comparable Position" provision to eliminate the phrase "levels of responsibility." Besides running counter to the provision's plain language, their interpretation results in strange and illogical outcomes. It creates a situation in which, for example, an executive employee in the E1 job band could be offered a job involving purely clerical duties yet not be facing a Demotion so long as her job title and compensation remained the same.

> FN3. The Court notes that Defendants argue throughout their papers that Nair retained her D3 band and tier ranking in the HRSDI job. This point can only be understood as another way of expressing that she remained a Director by title and that her compensation was not reduced. Pfizer admitted that it did not use the band and tier system to classify employees and that all Pharmacia employees' job bands were locked in place upon the Change in Control.

**\*9** Indeed, Defendants' argument on these mo-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
(Cite as: 2009 WL 1635380 (D.N.J.))

tions that a Demotion under the Plan is limited to a reduction in compensation or a formal change in status is belied by their own evidence. Westgate testified that the review of Nair's claim for benefits involved investigation into Nair's responsibilities in the HRSDI job for the purpose of determining how to classify the job under the Pharmacia band and tier structure. He admitted that if an employee's *responsibilities* would place her in a lower band and tier than the position she held prior to the acquisition, that employee would have suffered a Demotion under the Plan. The only evidence in the record regarding what Pharmacia band and tier would correspond to the HRSDI job based on the job's levels of responsibility is supplied by Nair.

Thus, the Court finds that Nair has demonstrated, as a matter of law, that her job responsibilities in the HRSDI job would constitute a demotion from her D3 position as Director of Global Management Development, making it a Demotion under Plan § 2.08. In other words, she has established, based on the facts in the record, that the continued employment she was offered after the Change in Control was *not* in a Comparable Position, and that she therefore experienced a Termination Due to Change in Control under the Plan.

2. *Untimely Rejection of Offer*

Defendants' second argument in opposition to Nair's motion for summary judgment and in support of their own addresses the timing of events. According to Defendants, Nair accepted the HRSDI job when she began to perform the HRSDI project assignments in May or June 2003 and then voluntarily resigned from that position in October 2003. They add, however, that whether or not the evidence establishes as a matter of law that Nair's severance of employment from Pfizer was a "Termination Due to Change in Control" or a "Voluntary Resignation" as defined by the Plan, Defendants are entitled to summary judgment because Nair is simply not eligible for separation benefits based on the dates of job offer (approximately May 2003) and notice that she did not wish to continue

employment with Pfizer in the HRSDI job (October 29, 2003). The Plan's relevant eligibility provision, § 3.01(d), requires that an employee who rejects an offer of continued employment that is not in a Comparable Position must give his or her rejection within two weeks of the offer to be eligible for separation benefits.

Defendants' "timeliness" argument fails because it is a belated, after-the-fact justification for denying Nair's claim for separation benefits. It would be improper for the Court to consider such a post hoc rationale on review of the benefits determination when it was not communicated to Nair during the administrative process, and indeed not until long after this litigation was underway. Neither the Administrative Committee's letter denying the claim nor the Named Fiduciary's decision to uphold the denial cite Plan provision § 3.01(d) or otherwise even suggest that Nair's failure to reject the HRSDI job offer within two weeks was a basis for Pfizer's determination. Moreover, the rationale was not even given during the discovery phase of this lawsuit. Defendants' responses to interrogatories and deposition questions specifically requesting the basis and/or reason for denying Nair's claim failed to invoke § 3.01(d) or even remotely refer to Nair's failure to reject the offer of continued employment within the required two-week period. Defendants raised this reason for Nair's ineligibility for the first time in their brief in opposition to Plaintiff's motion for summary judgment, filed on February 17, 2009, almost four years after the Administrative Committee advised Nair that her claim was denied.

*10 Defendants maintain that though they did not ground the denial of her claim on Nair's failure to meet the § 3.01(d) requirement, either at the Administrative Committee or Named Fiduciary level of review, the Court may nevertheless consider this basis for ineligibility in adjudicating the instant motions for summary judgment because under the Plan the Administrative Committee's determination of Nair's claim is subject to de novo review. (Plan § 6.03.) Defendants,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

however, provide no legal authority that supports their argument that because the Court may, on de novo review, evaluate a benefits determination based on the record below plus additional evidence, it may also accept after-the-fact rationales for the determination under review.

In fact, the legal authority cited to the Court militates against permitting defendant employers to "shore up" a denial of benefits with additional bases after the employee has initiated suit under ERISA to recover those benefits. *See Skredvedt v. E.I. DuPont de Nemours and Co.,* 268 F.3d 167, 178 n. 8 (3d Cir.2001) (observing that it would be improper to consider an ERISA plan administrator's "post hoc" reasons for denying benefits); *Schreibeis v. Ret. Plan for Employees of Duquesne Light Co.,* No. Civ.A. 04–969, 2005 WL 3447919, at *7–9 (W.D.Pa. Dec.15, 2005) (holding, in reliance on *Skredvedt,* that it was improper to consider post hoc rationales for plan's determination that plaintiff employee not eligible for benefits); *Doyle v. Nationwide Ins. Co.,* 240 F.Supp.2d 328, 347 (E.D.Pa.2003) (declining to consider administrator's post hoc rationales, in light of guidance provided by Third Circuit in *Skretvedt* ); *Carney v. Int'l Bhd. of Elec. Workers,* No. Civ.A. 00–6270, 2002 WL 1060652, at *5–6 (E.D.Pa. May 23, 2002) (holding, based on *Skredvedt,* that benefits decisions may not be supported by post hoc rationales never communicated to applicant for benefits). On this topic, the Third Circuit noted, in dicta, its agreement with the policy concerns expressed by another court of appeals in refusing to consider the justifications offered by plan administrators in litigation but not in the administrative record. *Skretvedt,* 268 F.3d at 168 n. 8. The *Skretvedt* court explained:

We note in this regard our agreement with the policy concerns identified in *University Hospitals of Cleveland v. Emerson Electric Co.,* 202 F.3d 839 (6th Cir.2000), where the court held that it would not defer to post hoc rationales for denying benefits claims generated for the purpose of litigation by

ERISA plan administrators when those rationales did not appear in the denial letters sent to the benefits claimants or in the administrative record. The court observed that:

it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.... To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them-or, worse yet, federal judges-to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

*11 Id.* (quoting *University Hospitals of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 848 n. 7 (6th Cir.2000). The Third Circuit, in this discussion, refers to the ERISA-imposed requirement that benefit review boards " 'provide adequate notice in writing' of a claim denial 'setting forth specific reasons for the denial.' " *Id.* (quoting ERISA § 503, 29 U.S.C. § 1133(1)). The *Skretvedt* court stressed the importance of providing specific reasons for denying benefits claims "both so that applicants may introduce the proper evidence on appeal and so that a federal court may exercise meaningful review." *Id.*

Defendants attempt to distinguish *Skretvedt* and the district court decisions that reject post hoc rationales based on the Third Circuit's commentary in *Skretvedt.* They point out that the courts in those cases reviewed the subject benefits determinations on an arbitrary and capricious standard, not a de novo standard. This distinction, if anything, further weak-

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

ens Defendants' position that the Court should accept their belated justification for denying Nair's claim for separation benefits. If it is improper to credit an after-the-fact justification when reviewing an administrator's decision on the very deferential arbitrary and capricious standard, then certainly the Court cannot consider it on the de novo standard, which is indisputably less favorable to the administrator. Moreover, the policy concerns underlying the Third Circuit's disapproval of post hoc rationales and its emphasis on the importance of complying with ERISA § 503's notice requirements would be defeated if the Court were to uphold Pfizer's decision to deny benefits on a basis not communicated to Nair in the administrative review process or even throughout Pfizer's defense of this litigation. Pfizer's very late presentation of Nair's failure to reject her offer of continued employment within the two-week timeframe as a basis for her ineligibility for benefits not only hampered Nair's challenge to the benefits determination but also has all the signs of a being a justification developed to defend a lawsuit, not the true basis for the administrative decision under review. De novo review permits the parties to submit additional evidence, not in the record below, to support their positions that the ERISA benefit decision under review was correctly or incorrectly made. _Luby v. Teamsters Heath, Welfare & Pension Trust Funds,_ 944 F.2d 1176, 1184–85 (3d Cir.1991). It does not provide Defendants an opportunity to interject a fact that did not exist in the past, that is, to give a rationale for their benefits decision that was not communicated to Plaintiff at the time of the determination as required by § 503.

**3. Summary Judgment for Plaintiff**

The Court takes note of Defendants' argument that, according to the principle that contracts should be construed as a whole, Plaintiff is not the kind of employee for which the Plan was designed. Defendants point out that the Plan, by its own terms, is intended to provide benefits supplemental to unemployment benefits to alleviate the financial hardships of an employee whose termination is company-initiated. In

contrast, Nair did not sever her ties with Pfizer until she had secured employment with a competing pharmaceutical company. It is undisputed that Nair commenced her employment with Schering immediately after terminating her employment with Pfizer. Defendants argue that she waited until she had the new job lined up to give notice at Pfizer and thus did not experience any financial hardship as a result of a company-initiated termination. According to Defendants, even assuming the job offered to Nair was not a "Comparable Position," her situation falls outside of the heartland of the Plan.

*12 The Court rejects this argument for two reasons. One, while the Plan purpose may be in tension with its application to this situation, the Court must construe the Plan according to its plain language. Construing the Comparable Position provision to render Nair outside of the Plan's eligibility parameters would require the Court to disregard the "levels of responsibility" language. It cannot. Two, the result Defendants urge the Court to reach by construing the contract as a whole would also amount to an end-run around the Court's decision not to accept or consider post hoc rationales for ineligibility. Defendants' may argue that Nair's decision to delay rejecting the HRSDI job offer until she had secured other employment places her outside of the intended reach of the Plan, but this amounts to a reiteration of the rationale that she did not timely reject the offer.

Based on the foregoing analysis, the Court finds that Plaintiff has met her burden under Rule 56 of demonstrating that she is entitled to separation benefits under the Plan. Defendants have failed to establish that they properly denied Plaintiff's claim for benefits and have failed to come forward with proofs raising genuine issues that would preclude this Court from awarding Plaintiff summary judgment on her ERISA claim to recover separation benefits. The Court will therefore grant Plaintiff's motion for summary judgment as to her claim for benefits brought pursuant to 29 U.S.C. § 1 132(a)(1)(B) and deny Defendants'

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

motion cross-motion as to that claim.

The Court will accordingly award Plaintiff a judgment in the amount of the separation benefit to which Plan Article IV entitles her. Plaintiff has calculated this benefit to be $158,250.30 (a figure based on her Base Pay and years of service as of the date of termination). Defendants have not contested this figure.

The Court will also award Plaintiff prejudgment interest, an equitable remedy that the Court may award in its discretion. *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 131 (3d Cir.2000). The Third Circuit has held that prejudgment interest in an ERISA action to recover plan benefits is presumptively appropriate, in recognition of the fact that otherwise, the "relief granted would fall short of making [the claimant] whole because he has been denied the use of the money which was his." *Id.* (quoting *Fotta v. Trustees of Untied Mine Workers of Am., Health & Ret. Fund of 1974,* 165 F.2d 209, 212 (3d Cir.1998)). The Third Circuit has approved of calculating the amount of prejudgment interest based on the statutory post-judgment interest rate set forth in 28 U.S.C. § 1961. *Id.* at 133. The statute on post-judgment interest provides that the rate should be "equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. As applied to this case, the applicable interest rate would be 2.22%, the one-year Treasury bill rate for the week ending June 18, 2004, the calendar week preceding the date on which Nair submitted her written claim for separation benefits to the Administrative Committee. The Court will accordingly apply that rate in computing prejudgment interest.

### C. *Plaintiff's Claim for Statutory Penalties*

**\*13** The Court will grant Defendants' motion for summary judgment on Plaintiff's claim for penalties under ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1),

which is based on Defendants' alleged failure to produce Plan documents within thirty days of Plaintiff's request.

ERISA § 104(b)(4) requires a plan administrator to furnish various plan documents to a plan participant or beneficiary upon request. 29 U.S.C. § 1024(b)(4). Section 502(c)(1) gives the district court the discretion to impose a statutory penalty on a plan administrator who fails to provide the documents within 30 days of receiving a participant's written request for the information. 29 U.S.C. § 1132(c)(1). *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1148 (3d Cir.1993).

Plaintiff has provided evidence that her former attorney requested Plan documents by letter dated January 9, 2007 [FN4] and that plan documents were not furnished until August 2007, when Plaintiff's current counsel sent another letter. Defendants, however, deny receiving the January 9, 2007. Even assuming the Court were to find that Plaintiff had established a violation of ERISA § 104(b)(4), it declines to award Plaintiff statutory penalties under § 502(c)(1) in its discretion. Though Plaintiff need not demonstrate actual harm or prejudice as a result of the failure to produce documents in a timely fashion, *Gillis,* 4 F.3d at 1148, "courts have either reduced the amount of penalty or declined to award penalties where no prejudice or intentional misconduct was shown." *Carney,* 2002 WL 1060652, at \*7 (declining to award plaintiff statutory penalties for defendants' late production of plan documents, noting lack of harm to plaintiff and plaintiff's failure to pursue request for documents vigorously). Here, Plaintiff has not made any demonstration that Defendants' failure to furnish the documents until approximately August 15, 2007 caused Plaintiff to incur damages or that it resulted or prejudice. The Court takes note of the fact that Plaintiff was not diligent in pursuing the documents and, indeed, made no follow-up efforts at all to obtain the documents for months following the January 2007 request. When a second letter was sent, on August 10, 2007, Defendants provided the documents within one

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

week. It appears improper to the Court to award Plaintiff the penalty of $100 a day for the time the documents were not provided when Plaintiff let the clock run and sat on the request for months without any further effort to obtain the documents.

> FN4. The Court notes that it basis this fact on the February 21, 2009 Affidavit of Patrick C. McGuinness, Plaintiff's former attorney. It does not rely on the January 19, 2009 Nair Affidavit, which Defendants have moved to strike on the grounds that it fails to satisfy the personal knowledge requirement of Federal Rule of Civil Procedure 56(e). The Court will thus dismiss the motion to strike as moot.

Thus summary judgment on Count II of the Complaint, for statutory penalties under ERISA § 502(c)(1), will be granted in Defendants' favor. Plaintiff's motion for summary judgment on this claim will accordingly be denied.

**D. Attorneys' Fees**

Having found that Plaintiff is entitled to summary judgment on her ERISA claim for benefits, the Court will also grant Plaintiff's application for attorneys' fees.

While the Court is not required to award a successful ERISA plaintiff attorneys' fees, it is well-established that "the defendant in an ERISA action usually bears the burden of attorney's fees for the prevailing plaintiff or plaintiff class." *McPherson v. Employees' Pension Plan of Am. Re–Ins. Co., Inc.,* 33 F.3d 253, 254 (3d Cir.1994). The Third Circuit has noted that fee-shifting under ERISA "encourages private enforcement of the statutory substantive rights, whether economic or noneconomic, through the judicial process." *Brytus v. Spang & Co.,* 203 F.3d 238, 242 (3d Cir.2000).

*14 To guide a district court in evaluating whether a prevailing plaintiff in an ERISA case should receive an award of attorneys' fees, the Third Circuit has articulated the following five factors to be considered by the court:

(1) the offending parties' culpability or bad faith;

(2) the ability of the offending parties to satisfy an award of attorneys' fees;

(3) the deterrent effect of an award of attorneys' fees against the offending parties;

(4) the benefit conferred on members of the pension plan as a whole; and

(5) the relative merits of the parties' position.

*Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983).

Application of these factors to Nair's case weighs in favor of awarding her fees. While the evidence presented to the Court does not demonstrate that Defendants denied Nair's claim in bad faith, it does indicate a level of culpability beyond a mere erroneous determination. The Administrative Committee endeavored to discover what Nair's job duties were in the HRSDI job and determine what Pharmacia job band the position would accordingly fall into. Although it was unable to obtain information about how the job would be classified based on the responsibilities, it nevertheless denied the claim based on the Comparable Position rationale. In providing the basis for the decision, the Administrative Committee stated that Nair failed to satisfy the Comparable Position provision but did not explain in what way. Moreover, it advised Nair of its determination almost ten months after she filed her claim for separation benefits, and well over a year after her termination. As for the second *Ursic* factor, Defendants are clearly able to satisfy an award of attorney's fees. Pfizer is a large and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074
**(Cite as: 2009 WL 1635380 (D.N.J.))**

successful pharmaceutical company doing business worldwide. According to its website, Pfizer is the world's largest research-based biomedical and pharmaceutical company, boasting $48.4 billion in revenues for 2007. As for the remaining factors, while the Court's disposition of this case may not confer a benefit on Plan participants as a whole—indeed, its impact appears to be limited to Plaintiff's individual case—an award of attorney's fees to Plaintiff will have a deterrent effect on Defendants with regard to the improper denial of claims. Finally, the Court finds, for the reasons discussed above, that all of the evidence presented demonstrated that the HRSDI job offered to Plaintiff was not a Comparable Position as that term is unambiguously defined in the Plan and thus Defendants' defense of their denial of Nair's claim on grounds that she was offered a Comparable Position was simply not tenable. In sum, the *Ursic* factors weigh in favor of awarding Plaintiff attorneys' fees in this matter.

The Court will accept a supplemental submission from Plaintiff, in accordance with Local Civil Rule 54.2, supporting her application for fees.

**E. *Nair's Cross–Motion For Leave To Amend Complaint***

**\*15** Finally, in the interest of completeness, the Court notes that in her brief in opposition to Defendants' motion for summary judgment, Plaintiff asks the Court for leave to file an amended Complaint to assert claims of equitable estoppel and breach of fiduciary duty under ERISA. The Court will dismiss this motion as moot because Plaintiff seeks leave to amend under Federal Rule of Civil Procedure 15 only in the event that the Court considered Defendants' argument that Plaintiff is ineligible for benefits because she did not reject the offer of the HRSDI job within two weeks. As discussed above, the Court has declined to consider this argument as an improper post hoc rationale for the benefits determination.

**III. CONCLUSION**

For the foregoing reasons, the Court will grant Plaintiff summary judgment on Count One of the Complaint, awarding her separation benefits under the Plan and pre-judgment interest. It will grant summary judgment in favor of Defendants on Count Two of the Complaint for statutory penalties under ERISA. Plaintiff's motion for leave to amend the Complaint and Defendants' motion to strike the January 19, 2009 Nair affidavit will be dismissed as moot. Finally, having determined that Plaintiff is entitled to an award of attorney's fees as the prevailing party on her ERISA claim for benefits, the Court will accept an application for attorneys' fees, properly supported by documents demonstrating fees incurred prosecuting that claim.

An appropriate form of Order will be filed herewith.

D.N.J.,2009.
Nair v. Pfizer, Inc.
Not Reported in F.Supp.2d, 2009 WL 1635380 (D.N.J.), 47 Employee Benefits Cas. 1074

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT  B

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
**(Cite as: 2005 WL 3447919 (W.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
Kathryn A. SCHREIBEIS, Plaintiff,
v.
RETIREMENT PLAN FOR EMPLOYEES OF
DUQUESNE LIGHT COMPANY, et al., Defendants.

No. Civ.A. 04-969.
Dec. 15, 2005.

James A. Welker, Jason Mettley, Jubelirer, Pass &
Intrieri, Pittsburgh, PA, for Plaintiff.

Daniel E. Wille, Reed Smith, Keithley D. Mulvihill,
Rawle & Henderson, Pittsburgh, PA, for Defendants.

*OPINION AND ORDER OF COURT*
AMBROSE, Chief J.
    *1 Plaintiff, Kathryn A. Schreibeis ("Plaintiff" or
"Schreibeis"), initiated this action on June 29, 2004,
alleging violations of the Employee Retirement In-
come Security Act of 1974, 29 U.S.C. § 1001, *et seq.*
("ERISA"), against Defendants Retirement Plan for
Employees of Duquesne Light Company ("Plan"),
Administrative Committee of the Plan (collectively
"Plan Defendants"), and Concentra Medical Centers,
L.L.C. ("Concentra"). Count I of the Complaint as-
serts an action for unlawful denial of disability re-
tirement benefits against the Plan Defendants, and
Count II asserts a claim for breach of fiduciary duty
against Concentra.

    Pending before the Court are Cross-Motions for
Summary Judgment filed by Plaintiff (Docket No. 25)
and the Plan Defendants (Docket No. 19). Concentra
also has filed a Motion for Summary Judgment against

Plaintiff. (Docket No. 22). After careful consideration
of the parties' submissions and for the reasons set forth
below, Concentra's Motion is granted, the Plan De-
fendants' Motion is granted in part and denied in part,
and Plaintiff's Motion is granted in part and the matter
is remanded to the Plan Administrator for further
proceedings.

I. *FACTUAL AND PROCEDURAL BACKGROUND*
    Unless otherwise indicated, the following mate-
rial facts are undisputed. [FN1]

> FN1. The Plan Defendants failed to file a
> separate concise statement of material facts
> as required by Local Rule 56.1. After re-
> viewing the submissions of the parties,
> however, I find that the material facts appear
> to be undisputed, and the parties agree on the
> contents of the administrative record. Thus,
> although the Plan Defendants' failure is in-
> excusable, I will not require them to file a
> separate statement of facts at this late stage.

    Defendant Retirement Plan for Employees of
Duquesne Light Company ("Plan") is an employee
pension benefit plan existing for the exclusive purpose
of providing retirement pension benefits to current and
former employees of Duquesne Light Company
("Duquesne Light"). The Plan is maintained and ad-
ministrated pursuant to a written document ("Plan
Document"), amended and restated effective April 1,
2001.[FN2] Prior to January 1, 2002, the Plan was ad-
ministrated by the Administrative Committee of the
Retirement Plan for Employees of Duquesne Light
Company, pursuant to Section 8.010 of the Plan
Document. Plan 0296. According to the Plan, the
Administrative Committee ceased to exist as of Janu-
ary 1, 2002. An amendment to the Plan Document
indicates that since January 1, 2002, Duquesne Light
has served as the named fiduciary and Plan Adminis-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
**(Cite as: 2005 WL 3447919 (W.D.Pa.))**

trator. Plan 0331-0332.

> FN2. Both Plaintiff and the Plan Defendants have submitted a copy of the Plan Document in support of their respective Motions for Summary Judgment. *See* Docket No. 19, Ex. B to Affidavit of Clare E. Browne ("Browne Aff."); Docket No. 28, Ex. 2. The parties also have supplied identical copies of the administrative record in this case. *See* Docket No. 19, Ex. A to Browne Aff.; Docket No. 28, Ex. 1. Both the Plan Document and the Administrative Record are labeled with Bates numbers (e.g., "Plan 0001"). The parties cite to the Bates numbers in their briefs, and I do the same here.

Plaintiff began employment with Duquesne Light Company ("Duquesne Light") on October 29, 1979. Plaintiff sustained a work-related shoulder injury in or around November 1998. Her last day of work was November 19, 1999, and her official date of termination was October 30, 2000.

In or about May, 2002, Plaintiff filed an application with the Plan Administrator for a disability retirement benefit. To qualify for a disability retirement benefit under the Plan, a participant must have completed at least ten years of vesting service and become "totally and permanently disabled" while an employee and prior to attainment of normal retirement age. Plan 0261. As defined in the Plan Document, "totally and permanently disabled" means:

that a physical or mental condition renders a Participant disabled to the extent that (i) the Participant's physician certifies, in the manner prescribed by the Plan Administrator, that the Participant is permanently and totally disabled, (ii) the Participant is found by a medical examiner selected by the Plan Administrator to be totally, and presumably, permanently disabled, and (iii) the Participant is eligible for and receives

disability benefits under the Social Security Act.

\*2 Plan 0254 (Plan Document § 1.480).

On or about January 24, 2002, the Social Security Administration issued a decision finding that Plaintiff was disabled within the meaning of the Social Security Act as of November 19, 1999, and that she was entitled to disability insurance benefits. Plan 0046-0059. Plaintiff provided the Plan Administrator with notice of her Social Security award in conjunction with her application for disability retirement benefits. Plaintiff's primary care physician, William S. Zillweger, M.D., also certified on the appropriate form ("Physician's Report") that he had examined Plaintiff and that Plaintiff became totally and permanently disabled on or about November 19, 1999. Plan 0008. Dr. Zillweger described Plaintiff's diagnosis as "history of stage III breast carcinoma, status post mastectomy. Shoulder impingement." *Id.*[FN3]

> FN3. The medical records contained in the Administrative Record indicate that Plaintiff was diagnosed with breast cancer in May 2000, over six months after her last day of work at Duquesne Light. Plan 0089-0090; 0160-0161.

On or about June 13, 2002, the Plan Administrator sent the Physician's Report and other information to Paul Seiferth, M.D., requesting that he review the information and indicate on the Physician's Report whether he agreed or disagreed with Dr. Zillweger's opinion. Plan 0010. On or about June 18, 2002, Dr. Seiferth checked a box on the Physician's Report indicating that he disagreed that Plaintiff was totally and permanently disabled. Plan 0008.

Clare Browne, Director, Qualified Plans for Duquesne Light, sent Plaintiff a letter dated July 17, 2002 indicating that Plaintiff's application for a disability retirement benefit had been denied. The letter in-

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
(Cite as: 2005 WL 3447919 (W.D.Pa.))

formed Plaintiff that "[a]lthough approved for disability benefits under the Social Security Act and determined disabled by your physician on the same date, November 19, 1999, the Company Physician does not agree that your disability is total and permanent based on the information provided by you." Plan 0038. The letter further explained that because the Company Physician did not agree that Plaintiff's disability was total and permanent, she did not qualify as "totally and permanently disabled" as defined by the Plan. *Id.* The letter concluded by informing Plaintiff that she had a period of 180 days to appeal the denial of her claim; that she could submit written documents, comments, records and other information in support of her appeal; and that she would be provided, upon written request, free and reasonable access to any other information relevant to her appeal. *Id.*

On or about August 1, 2002, Plaintiff appealed the Plan Administrator's initial claim determination. Plaintiff's appeal letter stated that Dr. Zillweger would be "sending a letter under separate cover" and that she also had "a rather large packet of medical records and social security paperwork to be forwarded if needed." Plan 0039. On or about August 14, 2002, Browne wrote to Plaintiff indicating that she had received Plaintiff's appeal request and stating that "[w]e will await the letter from Dr. Zillweger and other documents you will be sending that you mentioned in your August 1, 2002 letter to support your appeal." Plan 0042.

*3 Plaintiff forwarded Browne her supplemental medical documentation with a letter dated August 21, 2002. At the conclusion of her letter, Plaintiff indicated that "[a]s I understand, Dr. Zillweger should be forwarding his letter shortly." Plan 0045. Browne then directed that the entire administrative record (as it then-existed) be provided to Dr. Seiferth to be considered in his determination whether Plaintiff was totally and permanently disabled. Browne Aff. ¶ 17.

In an e-mail to Browne dated August 30, 2002,

Dr. Seiferth indicated that "[u]pon review of supplemental medical records, I find no supporting evidence to reverse the previous decision of 'not concurring with disability retirement.' Decision: I do not concur with granting disability retirement to Kathryn Schreibeis." Plan 0228. In a letter dated September 4, 2002, Browne notified Plaintiff that the Plan Administrator had denied her appeal. The letter explained that "[t]he physician selected by the Plan Administrator has reviewed the additional medical documentation, as requested by your attorney and he does not confirm Dr. Zillweger's conclusion that you are Totally and Permanently Disabled." Plan 0229.

On or about September 10, 2002, Plaintiff sent a letter to the Plan Administrator questioning how the Plan physician could have rendered a decision without having Dr. Zillweger's letter. Plaintiff indicated that as of September 9, 2002, Dr. Zillweger had not yet sent the letter. The Plan Defendants did not respond.

On June 29, 2004, Plaintiff filed her Complaint against Defendants in this Court. (Docket No. 1). The Plan Defendants answered the Complaint on August 24, 2004 (Docket No. 3). On September 20, 2004, Concentra filed a Motion to Dismiss Count II of the Complaint (Docket No. 7). I denied the Motion to Dismiss on October 27, 2004, (Docket No. 12), after which Concentra filed its Answer (Docket No. 13). On March 21, 2004, the parties filed the instant Motions for Summary Judgment and supporting briefs. The Motions are now ripe for review.

II. *STANDARD FOR SUMMARY JUDGMENT*
Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
**(Cite as: 2005 WL 3447919 (W.D.Pa.))**

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the nonmoving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex,* 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988) (quoting *Celotex,* 477 U.S. at 322).

### III. *LEGAL ANALYSIS*
A. *Claim for Denial of Benefits Against Plan Defendants*

1. *Administrative Committee as Defendant*

*4 Before reaching the merits of Plaintiff's denial of benefits claim, I first address the Plan Defendants' argument that the Administrative Committee is an improper defendant and thus should be dismissed as a party. This portion of Defendants' Motion for Summary Judgment is granted. The undisputed evidence shows that as of January 1, 2002-prior to the date Plaintiff filed her application for benefits-the Plan was amended to remove the Administrative Committee as the Plan Administrator and replace it with the Company. Plan 0331-0332 (First Amendment to the Plan); Browne Aff. ¶ 2. After January 1, 2002, the Administrative Committee ceased to exist. Browne Aff. ¶ 2. Because the Administrative Committee is a nonexistent and, therefore, improper party, the claims against it are dismissed. This ruling in no way affects the Plan's status as Defendant or its liability, if any, with respect to Count I of Plaintiff's Complaint. Indeed, the Plan admits that it "is and remains the only proper Defendant and that is all that is necessary." Plan Defendants' Surreply (Docket No. 38) at 3.

2. *ERISA Standard of Review*

"ERISA does not set out the standard of review for an action brought under § 1132(a)(1)(B) by a participant alleging that he has been denied benefits to which he is entitled under a covered plan." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997). Yet some guidance is available.

[I]n *Firestone Tire & Rubber Co. v. Bruch,* the Supreme Court addressed the question of the appropriate standard for actions challenging "denials of benefits based on plan interpretations." 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989). The Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956-57. Where the plan affords the administrator discretionary authority, the administra-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
(Cite as: 2005 WL 3447919 (W.D.Pa.))

tor's interpretation of the plan "will not be disturbed if reasonable."

*Mitchell,* 113 F.3d at 437 (footnote omitted). In other words, the *de novo* standard operates as a default. *Id.* Where the plan document has conferred discretionary authority on the plan administrator to make certain determinations, my review is limited to whether a specific determination was arbitrary and capricious. *Id.* at 439; *Abnathya v. Hoffman-LaRoche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993). The arbitrary and capricious standard applies to the plan administrator's interpretation of the terms of the plan as well as any factual determinations regarding a participant's eligibility for and entitlement to plan benefits. *Mitchell,* 113 F.3d at 438-39.

Here, the parties agree that the Plan vests with the Plan Administrator the discretion to determine eligibility for benefits. Plan 0296, 0297-0298 (Plan Document §§ 8.010, 8.040). Accordingly, I may overturn a decision of the Plan Administrator only if "it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381, 384 (3d Cir.2003). "A decision is supported by 'substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision.' " *Courson v. Bert Bell NFL Player Retirement Plan,* 214 F.3d 136, 142 (3d Cir.2000) (quoting *Daniels v. Anchor Hocking Corp.,* 758 F.Supp. 326, 331 (W.D.Pa.1991)). I am not free to substitute my own judgment for that of the Plan Administrator in determining eligibility for plan benefits. *Lasser,* 344 F.3d at 384. With this highly deferential standard in mind, I turn to the merits of the parties' cross-motions for summary judgment on this claim.

### 3. *Denial of Plaintiff's Benefits*

**\*5** The primary issue before me with respect to Count I of Plaintiff's Complaint is whether the Plan's decision to deny Plaintiff benefits was arbitrary and capricious. When reviewing a denial of benefits under the arbitrary and capricious standard, I may consider only the evidence available to the Plan Administrator at the time the decision in question was made. *Abnathya,* 2 F.3d at 48 n. 8; *Mitchell,* 113 F.3d at 440; *Stout v. Bethlehem Steel Corp.,* 957 F.Supp. 673, 691 (E.D.Pa.1997). The burden is on Plaintiff to demonstrate that the denial of benefits was arbitrary and capricious. *Stout,* 957 F.Supp. at 691.

As an initial matter, I disagree with Plaintiff to the extent she argues that the denial of benefits was arbitrary and capricious simply because her physician and the Social Security Administration ("SSA") found her to be disabled. To so conclude would render the Plan's definition of disability-which requires that the participant's physician, the SSA, *and* a physician selected by the Plan Administrator find that the participant is totally and permanently disabled-meaningless. The plain language of the Plan expressly contemplates that there will be situations where the Plan-selected physician legitimately does not agree that a participant is disabled. In such situations, the participant is not entitled to disability retirement benefits. Moreover, it is well-established that, unless otherwise provided in the Plan, the opinions of a treating physician and/or the SSA are not entitled to special deference in ERISA cases. *See, e.g., Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians."); *Pokol v. E.I. Du Pont De Nemours & Co.,* 963 F.Supp. 1361, 1380 (D.N.J.1997) ("[I]t is not inherently contradictory to permit an individual to recover benefits pursuant to the Social Security Act while being denied benefits pursuant to a private ERISA benefit plan."); *Sollon v. Ohio Cas. Ins. Co.,* No. Civ. A. 02-1632, 2005 WL 2768948, at *21 (W.D.Pa. Oct.25, 2005).

I also disagree that the fact that Dr. Seiferth did not physically examine Plaintiff before determining she was not disabled rendered the denial of benefits arbitrary and capricious. Nothing in ERISA or the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
**(Cite as: 2005 WL 3447919 (W.D.Pa.))**

Plan Document requires a physical examination or prohibits benefit plans or plan administrators from basing disability determinations on a review of medical evidence supplied by the participant. *See, e.g., Marcum v. Zimmer,* 887 F.Supp. 891, 897 (S.D.W.Va.1995) (upholding denial of benefits based on non-examining physician's review of medical evidence); *Sollon,* 2005 WL 2768948, at *20 (citing cases and noting that a plan administrator has no duty under ERISA to gather information in addition to that submitted with the claim).

I do agree with Plaintiff, however, that her claim was decided without adequate notice and a reasonable opportunity for a "full and fair review." Section 503 of ERISA, 29 U.S.C. § 1133, requires every employee benefit plan to:

**\*6** (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. The Department of Labor regulations implementing this section further provide, among other things, that:
... the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures-

... (ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

... (iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2); *see also id.* § 2560.503-1(g)(1) (requiring that notification set forth "the specific reason or reasons for the adverse determination"). The Plan failed to comply with these provisions in at least two ways. First, the Plan Administrator acted unreasonably in deciding Plaintiff's appeal without waiting for a promised letter from her treating physician, Dr. Zillweger, in support of the appeal. Second, the Plan acted arbitrarily and capriciously by failing to provide Plaintiff with the specific reasons for her claim denial. I will address each of these issues in turn.

a. *Dr. Zillweger's Letter*
As set forth above, ERISA requires that plans provide claimants the opportunity to submit written comments, documents, records, and other information relating to a claim for benefits. Here, although the Plan initially agreed in writing to await a letter from Dr. Zillweger in support of Plaintiff's appeal, it subsequently determined her claim less than two weeks later without having received the letter. The Plan never informed Plaintiff that it was moving ahead with her appeal without the letter and never responded to Plaintiff's post-appeal inquiries regarding the situation. It was unreasonable for the Plan to assume after so short a period that the letter was not forthcoming and/or to proceed without at least notifying Plaintiff.

The Plan now argues that Dr. Zillweger's letter would have had "no impact" on the appeal decision. I am at a loss as to how the Plan can make such an assertion without knowing what the letter would have contained. The Affidavit paragraph Defendant cites in support of its argument merely references the Plan's contention that it had no authority under language of

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
(Cite as: 2005 WL 3447919 (W.D.Pa.))

the Plan to grant Plaintiff benefits once Dr. Seiferth disagreed that Plaintiff was not disabled. *See* Browne Aff. ¶ 4. There is no telling, however, whether Dr. Seiferth's conclusion might have been different if he had the benefit of Dr. Zillweger's letter during his review. Defendant's argument that the letter was immaterial because Dr. Seiferth already had Dr. Zillweger's April 2002 certification that Plaintiff was totally and permanently disabled is likewise misplaced. The administrative record consistently indicates that although Dr. Seiferth was aware of Dr. Zillweger's opinion, he found insufficient evidence to support that conclusion. Again, Dr. Seiferth's decision might have been different if he had more from Dr. Zillweger than his conclusory certification.[FN4]

> FN4. The Plan's Brief also suggests that although the Plan "initially agreed to wait for Dr. Zillweger's statement," it no longer felt the need to do so after Plaintiff submitted medical documentation containing some records from Dr. Zillweger. Plan Defs.' Br. in Supp. at 14. This argument is meritless. The Plan's letter to Plaintiff stated that it would await both the additional documentation *and* Dr. Zillweger's letter. In addition, Plaintiff expressly indicated in her cover letter enclosing the medical documentation at issue that Dr. Zillweger's letter was not included and would arrive under separate cover. Plan 0043.

*7 Finally, the Plan faults Plaintiff for never sending the promised letter even after her appeal had been decided. If she had, the Plan submits, it could have reviewed the letter. This argument is specious. Plaintiff had no obligation to supply Dr. Seiferth's letter once the Plan denied her appeal. If anything, Plaintiff took affirmative action by promptly writing to the Plan after her appeal was denied expressing her confusion and questioning the Plan's decision to proceed without the letter. Plan 0230. The Plan, however, never responded or otherwise indicated to Plaintiff

that it would consider the letter post-appeal.

In short, it is not this Court's position to speculate *post hoc* as to what Dr. Zillweger's letter would have contained and what effect, if any, the letter would have had on Plaintiff's appeal. Rather, what is relevant is that the Plan's failure to await the letter after promising Plaintiff otherwise denied Plaintiff a reasonable opportunity for full and fair review on the administrative level.

b. *Specific Reasons for Claim Denial*
   As the Court of Appeals for the Third Circuit has recognized:

> To afford a plan participant whose claim has been denied a reasonable opportunity for full and fair review, the plan's fiduciary must [among other things,] ... notify the participant promptly, in writing and in language likely to be understood by laymen, that the claim has been denied and the specific reasons therefor. The fiduciary must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence.

*Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am.,* 715 F.2d 853, 857-58 (3d Cir.1983). The Court of Appeals has further explained that "[o]ne of the main purposes for the requirement that the denial letter provide specific reasons is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." ' *Skretvedt v. E.I. DuPont de Nemours & Co.,* 268 F.3d 167, 178 n. 8 (3d Cir.2001) (quoting *DuMond v. Centex Corp.,* 172 F.3d 618, 622 (8th Cir.1999)).

Here, although the denial of Plaintiff's claim stemmed from the disagreement of Dr. Seiferth-whom the Plan selected and held out as the "Company Physician"-that Plaintiff was totally and permanently

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
**(Cite as: 2005 WL 3447919 (W.D.Pa.))**

disabled, the Plan never supplied Plaintiff with any of the reasons behind Dr. Seiferth's decision either initially or on appeal. Indeed, no such reasons appear anywhere in the administrative record.

The Plan argues that it was not required to inquire into or provide Plaintiff with Dr. Seiferth's reasons because the Plan Administrator's discretion was limited to whether the three sources listed in the Plan Document (*i.e.,* Plaintiff's doctor, the Plan Doctor, and the SSA) agreed that Plaintiff was disabled, regardless of the reason. I disagree. Although the Plan language might not permit the Plan to grant benefits in the face of a denial by the Plan-selected physician, the Plan should at least have provided the reasons for the physician's decision to Plaintiff so that she could prepare an informed and meaningful appeal. *See Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 158 (4th Cir.1993) ("Plan administrators may not evade their responsibility under ERISA [to communicate the specific reasons for claim denial] by contracting to third parties the obligations they have under ERISA."). In so holding, I find it significant that the Plan did not limit Plaintiff's appeal to the issue of whether or not the Plan Administrator correctly decided that only two out of the three required sources opined that Plaintiff was disabled. Rather, the Plan allowed Plaintiff to submit medical documentation and other evidence in appeal of Dr. Seiferth's decision itself. Without any guidance as to the reasons for that decision, Plaintiff could not prepare adequately for further review of her claim. *See id.*

**\*8** The Plan further argues that, in any event, there is sufficient evidence in the administrative record to support Dr. Seiferth's conclusion that Plaintiff was not disabled and, therefore, the claim denial was not arbitrary and capricious. In particular, the Plan makes much of the fact that the record contains a letter from Plaintiff's shoulder surgeon, Alan Klein, M.D., indicating that Dr. Klein had reviewed a surveillance video of Plaintiff and concluded that, based on the video (which depicted Plaintiff lifting a bale of hay,

using a rake and shovel, and spreading a tarp), Plaintiff "is capable of performing some activities and therefore should not be considered permanently disabled in regard to her shoulders." Plan 0041, 0224. Again, I disagree. Although Dr. Klein's letter might constitute substantial evidence that Plaintiff is not disabled, it is impossible to tell from the administrative record whether Dr. Seiferth even reviewed that letter, let alone whether it formed the basis for his opinion. In addition, there is absolutely no indication in the record that the Plan ever made Plaintiff aware of Dr. Klein's letter prior to this lawsuit or in any way informed her that her appeal would be decided based upon evidence other than the documentation she provided. In so doing (or not doing), the Plan deprived Plaintiff of the chance to rebut Dr. Klein's letter and to pursue a meaningful appeal. *See Grossmuller,* 715 F.2d at 858 n. 5 ("[T]o be 'full and fair,' the review must provide a claimant with knowledge of the opposing parties' contentions and a reasonable opportunity to meet them.").

In addition to the above reasons, it is improper for me even to consider such *post hoc* rationales for Dr. Seiferth's conclusion that Plaintiff was not disabled. As the Court of Appeals for the Third Circuit aptly explained in *Skretvedt:*

We note in this regard our agreement with the policy concerns identified in *University Hospitals of Cleveland v. Emerson Electric Co.,* 202 F.3d 839 (6th Cir.2000), where the court held that it would not defer to post hoc rationales for denying benefits claims generated for the purpose of litigation by ERISA plan administrators when those rationales did not appear in the denial letters sent to the benefits claimants or in the administrative record. The court observed that:

it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
(Cite as: 2005 WL 3447919 (W.D.Pa.))

testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.... To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them-or, worse yet, federal judges-to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

*9 Id. at 848 n. 7.

268 F.3d at 178 n. 8.[FN5] Because neither the Plan nor Dr. Seiferth cited Dr. Klein's letter as a reason for benefit denial in the administrative record, I decline to do so now.

> FN5. Although the Court of Appeals decided *Skretvedt* on other grounds and thus did not reach the question of whether or not *post hoc* rationales ever should be credited, it specifically indicated its agreement with the above-quoted policy concerns. *Id.* at 178 n. 8.

For all the reasons set forth above, I grant Plaintiff's Motion for Summary Judgment against the Plan to the extent it alleges that the Plan deprived Plaintiff of a full and fair review of her benefits claim in violation of ERISA section 503. Plaintiff's Motion is denied, however, to the extent it requests that I order the award of disability retirement benefits. The remedy for a violation of section 503 is not to award benefits, but "to remand to the plan administrator so the claimant gets the benefit of a full and fair review." *Syed v. Hercules, Inc.,* 214 F.3d 155, 162 (3d Cir.2000). Accordingly, I will remand this action to the Plan Administrator with instructions to provide Plaintiff with a full and fair review of her claim.

**B.** *Breach of Fiduciary Duty Claim Against Concentra*

Concentra has moved for summary judgment as to Plaintiff's breach of fiduciary duty claim (Count II) on the grounds that, under the law and the undisputed facts, Concentra is not a fiduciary as defined by ERISA. I agree that Plaintiff has not pointed to any evidence to create a genuine issue of material fact on this issue and that Concentra is entitled to judgment as a matter of law.

In this case, Concentra is not a named fiduciary or the Plan Administrator. Section 3(21)(A) of ERISA defines three situations in which a person who is not a named fiduciary or plan administrator can assume a fiduciary duty. 29 U.S.C. § 1002(21)(A). They are:

(i) if the person exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) if the person renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) if the person has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.*

Plaintiff does not take issue with the second of these subsections. Instead, Plaintiff asserts that Concentra had discretionary authority over the Plan. Specifically, Plaintiff alleges that Dr. Seiferth, the physician selected by the Plan Administrator to review Plaintiff's case, was an agent of Concentra and exerted independent discretion in rendering his determination that Plaintiff was not totally and permanently disabled. Pl.'s Opp. Br. at 4-5. Plaintiff contends that this independent determination caused the Plan Administrator to deny Plaintiff's claim for disability retirement

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
(Cite as: 2005 WL 3447919 (W.D.Pa.))

benefits and, therefore, that Concentra through Dr. Seiferth acted in a discretionary manner directly affecting the administration of the Plan, *i.e.,* directly impacting the determination of Plaintiff's eligibility for benefits. *Id.* The evidence does not support Plaintiff's argument.

**\*10** Even if Dr. Seiferth had acted in a discretionary manner directly affecting the administration of the Plan (which he did not), there is no evidence that Dr. Seiferth acted on behalf of Concentra. As an initial matter, Concentra has submitted an affidavit and documentary evidence showing that, contrary to the allegations in Plaintiff's Complaint, Dr. Seiferth was not an employee of Concentra. Rather, Dr. Seiferth was employed by Occupational Health Centers of the Southwest, P.A. ("OHCS"). *See* Concentra's App. Ex. A (Affidavit of John T. Berry ("Berry Aff.")) and Ex. B (Physician Services Agreement between OHCS and Dr. Seiferth) (Docket No. 23).

In response, Plaintiff argues that the evidence shows that Dr. Seiferth nevertheless acted as an agent for Concentra. I disagree. According to the Professional Services Agreement between Concentra and OHCS attached to Concentra's Motion, Concentra owns and operates occupational health care facilities at various locations in Pennsylvania. Concentra's App. Ex. C. As set forth in the Agreement, OHCS contracted with Concentra to provide professional medical services at Concentra's health care facilities. *Id.* The Professional Services Agreement specifically states that:

[OHCS] and [OHCS]'s employees will be regarded as independent contractors of Concentra for all purposes, and shall represent themselves as such to third parties. *This Agreement shall not make [OHCS] or any employee of [OHCS] an agent of Concentra,* and neither [OHCS] nor its employees shall bind Concentra or transact business in Concentra's name, or make representations or commitments on Concentra's behalf, without the prior specific approval of Con-

centra.

Concentra App. Ex. C, ¶ 1 (emphasis added); *see also id.* ¶ 4(a) ("The rendition of all professional services, including, but not limited to, diagnosis, treatment and the prescription of medicine and drugs, and the supervision and preparation of medical records and reports shall be the sole responsibility of OHCS. Concentra shall have no authority whatsoever with respect to such activities."). Based on this language, neither OHCS nor Dr. Seiferth, as an employee of OHCS, had actual authority to act as an agent for Concentra, without specific prior approval from Concentra. In addition, there is absolutely no evidence that concentra ever specifically approved OHCS or Dr. Seiferth to act on its behalf. There also is no evidence of any contractual relationship of any kind between Concentra and the Plan or Plan Administrator.

The only evidence to which Plaintiff cites in support of her argument that Dr. Seiferth had actual or apparent authority to act as an agent of Concentra is that Dr. Seiferth's e-mail address was "Paul_Seiferth@concentra.com" and that the Plan's initial letter to Dr. Seiferth was addressed to Dr. Seiferth's address at Concentra. This evidence is simply insufficient to show an agency relationship. At most, this information shows the location at which Dr. Seiferth could be reached.

**\*11** Even if Concentra were a service provider who made recommendations to the Plan Administrator regarding medical issues, Plaintiff has not pointed to any evidence that concentra acted as a fiduciary of the Plan within the meaning of section 3(21)(A) of ERISA. As Concentra correctly notes, it is well-established that parties who render services (including professional services) or who offer and sell products to a retirement plan, but do not control the plan, generally are not fiduciaries under ERISA. *See Fechter v. Connecticut Gen. Life Ins. Co.,* 800 F.Supp. 182, 197 (E.D.Pa.1992); *Assocs. in Adolescent Psy-*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)
(Cite as: 2005 WL 3447919 (W.D.Pa.))

*chiatry v. Home Life Ins. Co.*, 941 F.2d 561, 568-70 (7th Cir.1991); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1150-51 (3d Cir.1989). Applying this principle, courts have specifically held that service providers who make recommendations to a plan or plan administrator, including recommendations regarding medical issues, are not ERISA fiduciaries. *See, e.g., Crocco v. Xerox Corp.*, 956 F.Supp. 129 (D.Conn.1997), *rev'd in part on other grounds*, 137 F.3d 105 (2d Cir.1998); *Colleton Regional Hosp. v. MRS Med. Review Sys., Inc.* 866 F.Supp. 896 (D.S.C.1994).

Here, the evidence at most shows that Dr. Seiferth reviewed certain medical documentation and opined that Plaintiff's disability was not total and permanent. There is no evidence that Dr. Seiferth or Concentra exercised any discretionary authority or control over the Plan's management or Plaintiff's ultimate entitlement to benefits. Indeed, the Plan admits that the Plan Administrator has the full discretionary authority to interpret the terms of the Plan and make all factual determinations regarding the eligibility and entitlement to the Plan's benefits. Plan Defs.' Br. (Docket No. 20) at 9. For this reason as well, Concentra's Motion for Summary Judgment is granted.

IV. *CONCLUSION*

For the reasons set forth above, the Plan Defendants' Motion for Summary Judgment is granted to the extent it seeks to dismiss the Administrative Committee as a defendant in this case and is denied in all other respects. Plaintiff's Motion for Summary Judgment against the Plan is granted except to the extent Plaintiff requests as a remedy an award of disability retirement benefits in her favor. Instead, this case is remanded to the Plan Administrator for a full and fair review in accordance with this Opinion, the Plan Document, and ERISA. Concentra's Motion for Summary Judgment is granted.

ORDER OF COURT

AND NOW, this 14th day of December, 2005,

after careful consideration of the submissions of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ORDERED that the pending Motions for Summary Judgment are GRANTED in part and DENIED in part as follows:

1.  Defendant Concentra Medical Centers, L.L.C.'s ("Concentra") Motion for Summary Judgment (Docket No. 22) is GRANTED and Concentra is dismissed as a Defendant in this action.

*12 2. The Motion for Summary Judgment filed by Defendants Retirement Plan for Employees of Duquesne Light Company and the Administrative Committee of the Plan ("Administrative Committee") (Docket No. 19) is GRANTED only to the extent that it seeks to dismiss the Administrative Committee as a Defendant in this case. The Administrative Committee is hereby dismissed as a Defendant in this action. The Motion is DENIED in all other respects.

3.  Plaintiff's Motion for Summary Judgment (Docket No. 25) is DENIED to the extent it seeks an award of disability retirement benefits. Plaintiff's Motion is GRANTED in all other respects, and this case is remanded to the Plan Administrator for further proceedings in accordance with the Opinion accompanying this Order.

4.  The Clerk of Court is hereby directed to mark this case "CLOSED" forthwith.

W.D.Pa.,2005.
Schreibeis v. Retirement Plan for Employees of Duquesne Light Co.
Not Reported in F.Supp.2d, 2005 WL 3447919 (W.D.Pa.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 3892055 (E.D.Cal.), 45 Employee Benefits Cas. 1797
**(Cite as: 2008 WL 3892055 (E.D.Cal.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
David JONES, Plaintiff,
v.
WESTERN CONFERENCE OF TEAMSTERS
PENSION PLAN, and Does 1 Through 10, Defendant.

No. 2:06-cv-2781 JAM DAD.
Aug. 21, 2008.

John Paul Henderson, Law Offices of John P. Henderson, Auburn, CA, for Plaintiff.

Clarissa A. Kang, Trucker Huss, San Francisco, CA, for Defendant.

*ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*
JOHN A. MENDEZ, District Judge.

**\*1** Plaintiff David Jones ("Jones") brought this action against Western Conference of Teamsters Pension Plan ("the Plan"), for violation of his rights under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), seeking judicial review of the Plan's denial of monthly pension benefits under his former employers' ERISA-based plan. The parties filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Jones' motion is GRANTED and the Plan's motion is DENIED.[FN1]

>   FN1. This motion was determined to be suitable for decision without oral argument. E.D. Cal. L.R. 78-230(h).

**BACKGROUND**
David Jones was employed as a truck driver by Emery Air Freight Corporation from 1984 to 1997. SUF ¶ 2. His employment involved picking up and delivering freight and operating a forklift in a warehouse. *Id.* Jones was also employed as a driver for Laura Scudders from 1991 to 1996 and at Menlo Worldwide Forwarding as a clerical employee from 1997 to 2004. *Id.* ¶ 3. Jones' covered employers were in the freight and food distribution industries. *Id.* ¶ 4.

On May 1, 2004, Jones retired and began receiving benefits from the Plan. *Id.* ¶ 1. In January 2006, Jones submitted a questionnaire to the Plan indicating that he had been working as a contractor with the United States Postal Service ("USPS") in Penn Valley, California since August 21, 2004. *Id.* ¶ 5. His job involved sorting and distributing mail, for which he obtained a license to operate a small Class C Jeep. *Id.* ¶¶ 5-6.

Under the terms of the Plan, non-covered employment after a participant's pension effective date is deemed suspendible if it is in a trade or craft in which the participant worked at any time while covered by the Plan before retirement, in an industry in which the participant worked at any time while covered by the Plan before retirement, and in any geographic area covered by the Plan. *Id.* ¶ 9. "Industry" for the purposes of the Plan's benefit suspension rules "includes any business activity of a type in which Employees were employed in Covered Employment on the Pensioner's Pension Effective Date." *Id.* ¶ 10. "Trade or craft" for the purposes of the Plan's benefit suspension rules "is (A) a skill or skills, learned during a significant period of training or practice, which is applicable in some occupations in some industry, (B) a skill or skills relating to selling, retailing, managerial, clerical or professional occupations, or (C) supervisory activities relating to a skill or skills described in (A) or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3892055 (E.D.Cal.), 45 Employee Benefits Cas. 1797
**(Cite as: 2008 WL 3892055 (E.D.Cal.))**

(B).” *Id.* ¶ 11. Both parties agree that the geographic area covered by the Plan includes the entire State of California. *Id.* ¶ 12.

Appendix C.1 of the Plan provides that “[a]n Age Pensioner permanently forfeits his right to receive the Suspendible Portion of his Retirement Benefit payment for any calendar month in which he completes more than the permissible number of Hours of Suspendible Employment, provided that the month in question begins before his 65th birthday.” If the month begins before the Petitioner's 60th birthday or before January 2003, the permissible hours of Suspendible Employment is less than 50; otherwise, the permissible number of Hours of Suspendible Employment is less than 85. *Id.* ¶ 13. Jones indicated on a questionnaire that he worked 120 hours per month from September to December 2004. *Id.* ¶ 5. Jones is 63 years of age. *Id.* ¶ 8.

*2 On April 19, 2006, the Plan's administrative office contacted Jones and informed him that they had found that his post-retirement employment as a mail carrier met the criteria for classification of suspendible employment. *Id.* ¶ 17. The letter requested that Jones reimburse the Plan for benefits received during each calendar month in which he received compensation for work that equaled or exceeded the applicable hours limit. *Id.*

In a letter dated May 11, 2006, Jones, through his attorney, appealed the administrative office's decision. *Id.* ¶ 18. Jones asserted that he was not working in the same trade or craft or industry as his pre-retirement employment. *Id.* The Plan's Benefits Review Committee (the “Committee”), considered Jones' appeal at its September 2006 meeting. *Id.* ¶ 19. The Committee denied Jones' appeal. *Id.* ¶ 21. In a letter dated September 7, 2006, the Plan again asked that Jones reimburse a portion of the benefits that he had been paid during the months that he worked more than the allotted hours of suspendible employment. *Id.* ¶ 22. As of November 2006, the Plan has suspended payment

of a portion of Jones' benefits. *Id.* ¶ 23. On December 8, 2006, Jones filed a Complaint seeking past, present, and future pension benefits. Docket at 1.

### OPINION

Rule 56 permits a court to grant summary judgment when “there is no genuine issue as to any material fact” and “the moving party is entitled to a judgment as a matter of law.” In this case, neither party contends that there are any genuine issues of material fact. *See* Pl. Opp. to Def. Mot. for Summary Judgment 3. Therefore, the Court need only apply the relevant substantive law. *See Arakaki v. Hawaii,* 314 F.3d 1091, 1094 (9th Cir.2002).

ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary. *See* 29 U.S.C. § 1132(a)(1)(B). It also creates federal court jurisdiction to hear such a claim. *See* 29 U.S.C. § 1132(e). Review of a decision to deny benefits is *de novo* review unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits; if the plan does grant such discretionary authority, the decision is reviewed for abuse of discretion. *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 866 (9th Cir.2008). Here, the relevant language of the Plan provides:

> The Trustees have the exclusive authority to interpret the Plan and any rules and procedures established under the Plan and to determine the rights of claimants under the Plan and under those rules and procedures.

> ...

> The decisions of the Trustees in all matters pertaining to the administration of the Plan are final and binding on all interested persons.

SUF ¶¶ 14-15. Because the Trustees are vested

Not Reported in F.Supp.2d, 2008 WL 3892055 (E.D.Cal.), 45 Employee Benefits Cas. 1797
(Cite as: 2008 WL 3892055 (E.D.Cal.))

with final and binding authority to determine eligibility for benefits, the Court must review the Plans denial of Jones' pension benefits under an abuse of discretion standard.

*3 Jones alleges that the Plan is operating under a conflict of interest which should be considered in determining whether there was an abuse of discretion. *See Nord v. Black & Decker Disability Plan,* 356 F.3d 1008, 1010 (9th Cir.2004) ("[W]here the benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (internal citations omitted). The Ninth Circuit has recognized that there is an inherent conflict of interest "when a plan administrator both administers the plan and funds it." *Saffon,* 522 F.3d at 868. As Defendant notes, however, the Plan is funded by contributions from hundreds of employers based on negotiated collective bargaining agreements. *See* Def. Rep. Re Def. Mot. for Summary Judgment 3. Furthermore, the plan is administered by a Taft-Hartley Act trust consisting of an equal number of union and employer trustees. Ex. E to Sander Decl. at 38. The union and employer trustees have to agree for the Committee to act. *See* 29 U.S.C. § 186(c)(5)(B). Because the Plan administrators consist of both union and employer trustees, and because they were separate from the Plan's numerous funding sources, Plaintiff has not demonstrated a conflict of interest. *See Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480, 481 (9th Cir.1990) ("Because the Board of Trustees consists of both management and union employees, there is no conflict of interest to justify less deferential review.").

The Court must therefore consider whether the Plan abused its discretion in denying Jones certain pension benefits by classifying his employment with the USPS as suspendible. To be suspendible, a participant's employment must both be in a trade or craft and be in an industry in which the participant worked at any time while covered by the Plan before retirement. The Plan argues that USPS is in the commercial freight industry. For the purposes of classifying employment as suspendible, "Industry" is defined as "any business activity of a type in which Employees were employed in Covered Employment on the Pensioner's Pension Effective Date." The Committee defined the freight industry as "products or materials ... being transported for a third party for hire." Ex. B to Sander Decl.

The Court finds that the Plan's failure to specifically consider the business activities of Jones' former and current employers was unreasonable. The Committee admittedly refused to consider the nature of the products or materials being transported or the method of transportation. *Id.* The Committee also failed to consider the fact that freight made up less than 4% of USPS profits for fiscal year 2005. Ex. A to Sander Decl. at WCT 000004. The only justification upon which the Plan relies for its overbroad definition of the freight industry is that it is consistent with its previous decision in the Sullivan case, in which a party who had worked as a truck driver for a private company sought to work as a truck driver, not a mail carrier, for USPS. See Ex. A to Sander Decl. at WCT 000029-31. Similarly, Defendants reliance on the Sixth Circuit's decision in *Whisman v. Robbins,* 55 F.3d 1140 (6th Cir.1995) is inapposite. In *Whisman,* the Sixth Circuit found that the USPS was in the same industry as United Parcel Service, a private mail delivery company. However, in making its determination, the Sixth Circuit looked specifically to the activities performed by each organization to determine that they were in the same industry. *Id.* at 1149 (noting that both organizations engage in overnight delivery of letters and delivery of parcels). Here, the Plan unreasonably failed to compare the specific business activities of USPS with those of Jones' previous employers.

*4 Even assuming that Jones' previous employers and USPS are in the same industry, however, the Plan was also unreasonable in determining that Jones engaged in the same trade or craft as in his previous

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3892055 (E.D.Cal.), 45 Employee Benefits Cas. 1797
**(Cite as: 2008 WL 3892055 (E.D.Cal.))**

employment. For the purpose of determining whether employment is suspendible, one of the definitions of "trade or craft" is "a skill or skills, learned during a significant period of training or practice, which is applicable in some occupations in some industry." Jones used different skills in his former and current employment. In his previous employment, Jones worked as a truck driver and forklift operator, for which he obtained a Class B Commercial License with a HAZMAT endorsement. Jones delivered heavy freight for commercial customers. In his current employment, Jones sorts and delivers mail and operates a small Class C Jeep with a steering wheel on the right. Furthermore, Jones' new employment required nine months of training, suggesting that the skills he obtained in his previous employment were not transferrable. *See* 29 CFR 2530.203-3(c)(2)(ii) ("Factors which may be examined include whether there is a customary and substantial period of practical, on-the-job training or a period of related supplementary instruction."). The Plan's determination that mail delivery on a rural mail route involved the same trade or craft as operating a commercial freight truck was unreasonable and an abuse of discretion. Accordingly, the Plan abused its discretion by unreasonably determining that Jones' current employment as a mail carrier was in the same industry and trade or craft as his former employment as a commercial truck driver.

### ORDER

For the reasons set forth above, Jones' Motion for Summary Judgment is GRANTED. The Plan is directed to immediate reinstate Jones' monthly disability benefits retroactive to November 2006, with interest. Jones may also be entitled to an award of reasonable attorneys' fees and costs. *See* 29 U.S.C. § 1132(g). The Court will entertain a separate motion for attorneys' fees and costs.

IT IS SO ORDERED.

E.D.Cal.,2008.
Jones v. Western Conference of Teamsters Pension Plan
Not Reported in F.Supp.2d, 2008 WL 3892055 (E.D.Cal.), 45 Employee Benefits Cas. 1797

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.